# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 |
| SKYLINE RIDGE, LLC, | Case No. 4:18-bk-01908-BMW |
| Debtor(s). | **RULING AND ORDER REGARDING PLAN CONFIRMATION** |

This matter came before the Court pursuant to the *Debtor's 2nd Amended Plan of Reorganization Dated September 27, 2018* (DE 166)[1] filed by Skyline Ridge, LLC ("Skyline" or the "Debtor") on September 27, 2018, as amended, modified, and restated by the *Debtor's Second Amended, Modified, and Restated Plan of Reorganization* (TE 21),[2] the *Non-Adverse Modification re: Class 13, Class 14 & All Disputed Claims* (DE 312), the *Notice of Non-Adverse Modification of Plan Regarding Interest Accrual Date on Unsecured Claims* (DE 582), and various stipulations[3] (collectively, the "Debtor's Plan"); the competing *Cinco Plan of Reorganization Dated September 18, 2018* (TE 23) filed by Cinco Soldados, LLC ("Cinco") on September 25, 2018, as amended and modified by the *First Modified Cinco Plan of*

---

[1] References to entries on the administrative docket in this case, of which the Court will take judicial notice, are indicated by "DE __."

[2] References to exhibits introduced into evidence are indicated by "TE __." The Court will refer to documents that are both trial exhibits and docket entries using their trial exhibit numbers.

[3] Namely, the *Stipulation Between the Debtor and Fotinos Properties, LLC Regarding Treatment of Fotinos' Secured Claim Against the Debtor, and Acceptance of Debtor's Plan of Reorganization* (DE 267); the *Stipulation Between the Debtor and Rallis Creditors Allowing Claim and Modifying Plan Treatment of Class 7 Claim* (TE 31); and the *Stipulation and Plan Modification Concerning Homeowners Association Claims* (DE 294).

*Reorganization Dated September 18, 2018* (DE 588) and various stipulations[4] (collectively, "Cinco's Plan"); *Creditor David Parri's Objection to Confirmation of Debtor's Second Amended Plan of Reorganization* (DE 281; *see also* DE 402); *Creditors Earth's Healing, Inc., Vicky Puchi-Saavedra and Eduardo Saavedra's Objection to Confirmation of Debtor's Second Amended Plan of Reorganization* (DE 288; *see also* DE 403); *Trudy A. Nowak's Objection to Debtor's 2nd Amended Plan of Reorganization Dated September 27, 2018* (DE 292); Cinco's *Objection to Confirmation of Debtor's Plan* (DE 298); Sami Zarifi 14, LLC's *Objection to Cinco Soldados, LLC's Plan and Support of Skyline Ridge, LLC's Plan* (DE 290), *Elevens [LLC's] Objection to the Cinco Soldados Plan of Reorganization* (DE 296); the Rallis Creditor Group's[5] *Objection to the Cinco Soldado's Plan of Reorganization* (DE 299); *[The Debtor's] Objection to the Competing Plan of Reorganization Proposed by Cinco Soldados, LLC* (DE 300); and all filings related thereto.

A contested confirmation hearing was conducted on December 17 and 18, 2019, January 16 and 23, 2020, and February 6, 2020, at which time the parties presented evidence. Testimony was provided by Ahmad Zarifi ("Mr. Zarifi"), the sole member and manager of the Debtor; James S. Bradley ("Mr. Bradley"), an expert witness in the area of real estate valuation; Christopher G. Linscott ("Mr. Linscott"), the accountant for the Debtor, an expert witness in the field of accounting and as to feasibility of the Debtor's Plan, and the proposed disbursing agent under both plans; Benjamin A. Alev ("Mr. Alev"), the managing member of creditor Elevens,

---

[4] Namely, the *Settlement Stipulation and Plan Modification Concerning Homeowners Association Claims* (DE 266); the *Settlement Stipulation and Plan Modification Concerning Pima County Claims* (DE 273); the *Settlement Stipulation and Plan Modification Concerning Trustee of RL Ventures, LLC* (DE 285); the *Settlement Stipulation and Plan Modification Concerning David Parri Claim* (DE 289); the *Settlement Stipulation and Plan Modification Concerning Claims of Earth's Healing, Inc. and Vicky Puchi-Saavedra Eduardo Saavedra* (DE 293); and the *Settlement Stipulation and Plan Modification Concerning Paula Stachowski and Daniel Stromberg Claims* (DE 531).

[5] Thomas J. Rallis and Mary P. Rallis, Trustees of the Thomas Rallis and Mary Rallis Trust dated December 19, 2002; Mark A. Clark and Susan B. Clark, Co-Trustees of the Mark and Susan Clark Family Trust UA September 13, 2002; John W. McDonald and Connie McDonald; Hit Tank LLC; Harriet Coulter; Karena Coulter; John W. McDonald, Trustee of the John W. McDonald Profit Sharing Plan; Samuel D. Alfred and Magan G. Alfred, Trustees of the Samuel D. Alfred and Magan G. Alfred Revocable Living Trust dated November 17, 2006; and Ronald D. Mercaldo and Dawn C. Mercaldo, Trustees under the Ronald D. Mercaldo and Dawn C. Mercaldo Revocable Living Trust dated May 21, 2008 will be collectively referred to as the "Rallis Creditor Group."

LLC ("Elevens"); Ted M. Fotinos ("Mr. Fotinos"), the designated decision-maker for creditor Fotinos Properties, L.L.C. ("Fotinos"); John Rallis ("Mr. Rallis"), the agent of the Rallis Creditor Group; Trudy A. Nowak ("Ms. Nowak"), the chapter 7 trustee for the estate of creditor RL Ventures, LLC ("RL Ventures");[6] Vicky Puchi-Saavedra ("Ms. Puchi-Saavedra"), a creditor and the president of creditor Earth's Healing, Inc. ("Earth's Healing"); David Parri ("Mr. Parri"), a creditor; Paula Stachowski ("Ms. Stachowski"), a creditor;[7] Samuel Zarifi ("Mr. S. Zarifi"), a son of Mr. Zarifi, the owner of the Debtor's proposed post-confirmation financier Will Power Properties, LLC ("Will Power"), and the owner of insider creditor Sami Zarifi 14, LLC ("Sami Zarifi 14"); Christopher H. Sheafe ("Mr. Sheafe"), the manager and majority member of Cinco; E. Michael Carlier ("Mr. Carlier"), an original member of Cinco; David A. McEvoy ("Mr. McEvoy"), a former attorney for Cinco; Nicole T. Harrigan ("Ms. Harrigan"), an accountant for Cinco; and Terri Kresha, a resident of Cinco's subdivision.

The Debtor, Cinco, Fotinos, and certain general unsecured creditors[8] submitted post-trial briefs on March 2, 2020. (DE 583; DE 584; DE 589). Closing arguments were presented on April 9, 2020, at the conclusion of which the Court took this matter under advisement.

Based on the pleadings, arguments of counsel, testimony offered, exhibits entered into evidence,[9] and the entire record before the Court, the Court now issues its ruling.

## I.    Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(L). This is a contested matter governed by Federal Rule of Bankruptcy Procedure 9014. The following constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to contested matters by Federal Rules of

---

[6] See bankruptcy case 4:14-bk-16095-SHG.

[7] Although Ms. Stachowski, along with Daniel Stromberg (collectively, "Stachowski/Stromberg"), filed an untimely proof of claim, the Court granted Stachowski/Stromberg's *Motion for Leave to File Late Proof of Claim* (DE 463) prior to the start of the evidentiary hearing, whereby allowing the filing of the proof of claim. (DE 512).

[8] Specifically, Mr. Parri, Earth's Healing, Ms. Puchi-Saavedra and Eduardo Saavedra (collectively with Ms. Puchi-Saavedra, the "Saavedras"), and Stachowski/Stromberg.

[9] The Court conditionally admitted certain exhibits during the course of the evidentiary hearing. The Court will address relevant outstanding evidentiary objections in the body of this decision to the extent necessary.

Bankruptcy Procedure 9014(c) and 7052.

## II.  **Background**

The Debtor is an Arizona limited liability company that was formed by Mr. Zarifi in 1994. (DE 420 at ¶ 16). Mr. Zarifi has been the sole member and manager of the Debtor since approximately 2013. (DE 420 at ¶ 2; 12/18/2019 Trial Tr. 80:17-23). During the pendency of this case, the Debtor has been in the business of holding and selling real estate in Tucson, Arizona.

Cinco is an Arizona limited liability company that was formed by Mr. Sheafe and his former wife, as co-trustees of the Sheafe Living Trust UA Dated February 29, 1984 (the "Sheafe Trust"), Mr. Zarifi, Mr. Carlier, Raul Pina ("Mr. Pina"), and Wajdi El-Ghotme ("Mr. El-Ghotme") in July 2006 for investment purposes, specifically to acquire and develop approximately 158 acres of land on the east side of Tucson (the "Rancho Soldados Property") for a purchase price of approximately $11 million. (TE 87 at §§ 1.5, 2.18, 3.1.1; DE 420 at ¶ 26; *see also* DE 563 at ¶¶ 10, 13).

Prior to the formation of Cinco, Mr. Sheafe, Mr. Carlier, and Mr. Pina had engaged in business dealings with one another. (12/18/2019 Trial Tr. 17:17-18:14, 18:21-23). Mr. Carlier, who brought together the original members of Cinco, brought Mr. Zarifi and Mr. El-Ghotme in as financial investors. (DE 452 at ¶ 10; DE 563 at ¶ 10; 12/17/2019 Trial Tr. 209:12-17). Neither Mr. Zarifi nor Mr. El-Ghotme, who are related, had any prior business dealings with Mr. Sheafe or Mr. Pina prior to the formation of Cinco. (1/16/2020 Trial Tr. 86:2-4; 2/6/2020 Trial Tr. 126:21-127:8). Mr. Sheafe and Mr. Zarifi are sophisticated businessmen, and Mr. Zarifi was individually represented by counsel at the time of Cinco's formation. (*See* 12/17/2019 Trial Tr. 214:2-21; 1/16/2020 Trial Tr. 148:9-10; DE 420; DE 563).

Cinco purchased the Rancho Soldados Property in 2006 at the height of the real estate boom in Tucson. (DE 420 at ¶ 26; DE 563 at ¶ 18). Cinco's purchase of the Rancho Soldados Property was funded by a $6 million loan from Alliance Bank (the "Bank Loan" and the "Bank," respectively) secured by a first-position deed of trust on the Rancho Soldados Property, a $4 million loan from the Debtor (the "Skyline Loan") secured by a second-position deed of trust

on the Rancho Soldados Property, and cash from Cinco's members. (DE 420 at ¶ 28; 1/16/2020 Trial Tr. 10:18-11:23; TE 87 at §§ 3.2.1-3.2.2).

In order to preserve certain zoning entitlements, Cinco had to record a plat of the Rancho Soldados Property within one year, which deadline was met. (DE 452 at ¶ 8; DE 563 at ¶ 12; 12/18/2019 Trial Tr. 36:7-19, 37:5-14; 2/6/2020 Trial Tr. 146:12-13). To date, the infrastructure for the Rancho Soldados Property has been partially, but not fully completed. (*See* 2/6/2020 Trial Tr. 84:10-22, 86:1-4).

Currently, Mr. Zarifi and Mr. Sheafe are the sole members of Cinco. (1/16/2020 Trial Tr. 40:20-21). Mr. Zarifi holds a 43.53% interest in Cinco, Mr. Sheafe holds a 56.47% interest in Cinco, and Mr. Sheafe is and has always been the manager of Cinco. (DE 563 at ¶ 11; 1/16/2020 Trial Tr. 41:11-24; TE 106; *see also* TE 87 at § 1.7).

The Debtor, Cinco, Mr. Zarifi, Mr. Sheafe, and/or their affiliates have been involved in litigation for a number of years. There are unresolved disputes regarding, among other things, how much is owed by Cinco to the Debtor on the Skyline Loan.

## III. The Bankruptcy

On March 1, 2018 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code,[10] and the Debtor has continued as the debtor-in-possession. (*See* DE 1). The Debtor filed for bankruptcy in order to prevent its largest secured creditor, The Northern Trust Company ("Northern Trust"), from foreclosing on the majority of the Debtor's assets. (1/16/2020 Trial Tr. 49:13-19; DE 420 at ¶¶ 22-24).

As of the Petition Date, the Debtor's assets consisted primarily of real property, litigation claims, and notes receivable, with the Debtor valuing its total assets in an amount in excess of $12 million. (DE 72).

The Debtor scheduled secured debt in an amount not less than $2.5 million and insider and non-insider unsecured debt in an amount not less than $466,000. (*See* DE 31; DE 73; DE 265). A number of unsecured proofs of claim were also filed, which proofs of claim the Debtor

---

[10] The Bankruptcy Code, title 11 of the United States Code, will hereinafter be referred to as the "Code."

disputes, and which underlying claims are contingent and unliquidated.[11]

On June 29, 2018, the Debtor filed its first plan of reorganization, and on July 12, 2018, the Debtor filed its first disclosure statement. (DE 114; DE 118).

On September 20, 2018, the Court terminated the Debtor's exclusivity period for cause. (DE 160). Shortly thereafter, Cinco filed Cinco's Plan and an accompanying disclosure statement. (TE 24; TE 23).

In December 2018, the Court approved the *Debtor's Disclosure Statement Dated November 29, 2018 for Debtor's Plan of Reorganization Dated September 27, 2018* (the "Debtor's Disclosure Statement") (DE 218) and Cinco's *Notice of Submission of Amended Disclosure Statement for Cinco Plan of Reorganization Dated September 18, 2018* ("Cinco's Disclosure Statement") (DE 217), and set the competing plans for contested confirmation hearings. (DE 221; DE 223).

During the pendency of this case, the Debtor sold several parcels of real property and used a portion of the net sale proceeds to pay certain secured debts, with the remainder being deposited into the Debtor's debtor-in-possession account. (DE 534 at § II.5; *see also* TE 20; DE 573). Certain other secured debts were paid from the sales of property owned by non-debtor parties. (DE 534 at § II.5). Additionally, several lots within the Rancho Soldados Property were sold, and the net proceeds of these sales were deposited into the Debtor's debtor-in-possession account to be credited against the Skyline Loan in exchange for partial releases of the Debtor's deed of trust on the Rancho Soldados Property. (DE 534 at § II.5; *see also* DE 567; DE 573; DE 581).

As a result of the foregoing property sales, certain of the Debtor's pre-petition secured debts have been satisfied in full, including: (a) the secured claims of Northern Trust in the amount of $1,378,625.70; (b) one of the secured claims of Fotinos in the amount of $120,000;

---

[11] These disputed proofs of claim are: Proof of Claim 3-5 filed by Mr. Parri in the amount of $238,061.98; Proof of Claim 4-1 filed by Ms. Nowak, as trustee on behalf of RL Ventures, in the amount of $168,837.03; Proof of Claim 29-1 filed by Cinco in an unspecified amount; Proof of Claim 32-1 filed by Earth's Healings in an unspecified amount; Proof of Claim 33-2 filed by the Saavedras in an unspecified amount; and Proof of Claim 35-1 filed by Stachowski/Stromberg in an amount of not less than $1,000,000.

(c) the secured claims of homeowners' associations Cobblestone Homeowners' Association, The La Reserve Community Association, and Skyline Country Club Estates Improvement Association; and (d) all pre- and post-petition real property tax claims secured by the sold parcels. (DE 534 at § II.6; *see also* DE 255; DE 264; TE 20; DE 573). In addition, the Debtor paid all of its other pre- and post-petition real property tax debt owing as of February 28, 2019, albeit without prior Court approval. (DE 534 at § II.7; DE 278).

The Debtor's remaining liabilities are: (a) administrative claims; (b) a secured claim held by Fotinos, which claim was filed in the amount of $553,980.23; (c) the balance owed on the secured claim held by the Rallis Creditor Group, which balance totaled a minimum of approximately $155,000 as of March 2, 2020;[12] (d) the secured claim held by Elevens in the approximate amount of $20,800, which claim was previously held by France Terrace Townhomes, Inc. ("France Terrace"); (e) the non-insider general unsecured claims, which claims, as asserted, total no less than $1.42 million, but most of which claims are disputed, contingent, and unliquidated; and (f) the insider general unsecured claims, which total $230,000.

Non-insider general unsecured creditors Mr. Parri, Earth's Healing, the Saavedras, Ms. Nowak on behalf of the estate of RL Ventures, and Cinco have filed objections to the Debtor's Plan.[13] (DE 281; DE 288; DE 292; DE 298; DE 402; DE 403). The Debtor, secured creditors Elevens and the Rallis Creditor Group, and insider general unsecured creditor Sami Zarifi 14 have filed objections to Cinco's Plan.[14] (DE 290; DE 296; DE 299; DE 300). As of the contested confirmation hearing, all filed objections remained outstanding.

A.     **The Competing Plans**

Both plans are full payment plans of reorganization, and under either plan Mr. Linscott, or such other person appointed by the Court, would serve as disbursing agent (hereinafter, the "Disbursing Agent"). (*See* TE 21; DE 588).

---

[12] This amount does not include any attorneys' fees to which the Rallis Creditor Group may be entitled. (*See* DE 583 at Ex. B).

[13] In addition to the parties that filed formal, written objections to the Debtor's Plan, Stachowski/Stromberg have participated in these proceedings in opposition to the Debtor's Plan.

[14] In addition to the parties that filed formal, written objections to Cinco's Plan, Mr. Zarifi and Fotinos have participated in these proceedings in opposition to Cinco's Plan.

1.     **Overview of the Debtor's Plan**

Under the Debtor's Plan: (1) administrative expense claims would be paid pursuant to the Code; (2) secured claims would be paid in full or in stipulated amounts within one year of the Effective Date;[15] (3) non-insider general unsecured claims would be paid, to the extent allowed, in 36 equal monthly installments, with interest at the federal statutory rate, with payments to commence upon the earlier of payment in full of all claims of higher priority or one year after the Effective Date; and (4) insider general unsecured claims would be paid in full with interest at the federal statutory rate upon the earlier of the time all claims of a higher priority had been paid in full, or five years after the Effective Date. (*See* TE 21; TE 31; DE 267; DE 312; DE 582).

The Debtor proposes to fund its plan using: (1) cash on hand; (2) proceeds from asset sales; (3) exit financing provided by Will Power in an amount up to $400,000; (4) proceeds received on account of the Skyline Loan; (5) net litigation proceeds, if any; and/or (6) other funds the Debtor, in its sole and absolute discretion, decides to contribute. (TE 21 at §§ 4.1-4.2).

2.     **Overview of Cinco's Plan**

Under Cinco's Plan: (1) administrative claims would be paid in full on the later of the Distribution Date,[16] the date any such claims become allowed, or upon such other terms as may

---

[15] Under the Debtor's Plan, the Effective Date is "the first (1st) Business Day following the date on which the Confirmation Order has become a Final Order." (TE 21 at § 1.24).

[16] Under Cinco's Plan, the Distribution Date is "the first business day after the Effective Date funds are available for distribution." (DE 588 at § VIII.A.31). Mr. Sheafe testified that funds would be available for distribution within 30 days of confirmation. (*See* 2/6/2020 Trial Tr. 82:25-83:6).

The Effective Date is defined as "the first Business Day (a) that is at least 14 days after the Confirmation Date [defined as 'the date the Confirmation Order becomes a Final Order']; (b) on which no stay of the Confirmation Order is in effect; (c) no request for revocation of the Confirmation Order under Code § 1144 shall have been made, or, if made, shall remain pending; and (d) on which all of the following conditions have been satisfied or waived by Cinco:

1. The Bankruptcy Court shall have approved by Final Order a Disclosure Statement with respect to this Plan;
2. The Confirmation Order shall be in form and substance acceptable to Cinco;
3. Any outstanding fees of the United States Trustee under 28 U.S.C. § 1930 have been paid in full;
4. Cinco has paid the Settlement Payment [i.e. 'the unpaid principal balance of the Skyline Note, applying all payments to principal'] via cash or wire transfer to the Disbursing Agent;
5. All other agreements, writings and undertakings required under the Cinco Plan shall be executed and ready for Consummation [i.e. 'commencement of distributions on the Effective Date']."

be agreed upon; (2) allowed secured claims would be paid in full on the Distribution Date; (3) non-insider general unsecured claims would be paid in full on the later of the Distribution Date, the date the claim becomes allowed, or as otherwise agreed by the parties, with many of the non-insider general unsecured claims to be paid on the Distribution Date pursuant to the filed stipulations referenced above; and (4) all insider general unsecured claims would be paid in full on the later of the Distribution Date, the date the claim becomes allowed, or as otherwise agreed by the parties, and any lien claims asserted against property of the Debtor would be avoided unless specifically allowed in Cinco's Plan. (*See* DE 588; DE 285; DE 289; DE 295; DE 531).

Cinco proposes to fund its plan using the settlement proceeds it pays to the Debtor pursuant to the compromise of disputes between Cinco and the Debtor set forth in Cinco's Plan. (*See* DE 588 at § IV.A; DE 584 at Ex. A).

### 3. Comparison of Claim Treatment Under the Competing Plans

More specifically, the plans, as amended, modified, and restated, propose to classify and treat the remaining claims in this case as follows:

### a. Administrative Expense Claims and U.S. Trustee Fees

The administrative expense claims allowed under §§ 503(b) and 507(a)(1), including all actual and necessary expenses to preserve the estate, Court fees, professional fees, and outstanding post-petition real property taxes, are estimated to total between $173,000 and $263,000.[17] (DE 583 at Ex. A).

Under the Debtor's Plan, administrative expense claims would be paid in compliance with the provisions of the Code. (TE 21 at §§ 2.1 & 3.1).

Under Cinco's Plan, administrative expense claims would be paid in full in cash on the later of: (1) the Distribution Date; (2) the date the claim becomes an Allowed Claim;[18] or (3) the

---

(DE 588).

[17] Cinco has filed an interim application for allowance of a substantial contribution claim in the amount of $89,462.32, which interim application remains pending. (DE 459). Given that the interim application has not been ruled upon, the lower estimate does not include any substantial contribution claims that may be allowed in this case. The parties have represented to the Court that there would be sufficient funds to pay all administrative claims as allowed.

[18] As defined in Cinco's Plan: "every Claim [as defined in § 101(5)] against Debtor's Estate as to which:
    a. a proof of such Claim has been filed (or as to which an appropriate application for an

date and upon such other terms as may be agreed upon by the holder of the claim and Cinco or ordered by the Court. (*See* DE 588 at § II.A.1, VIII.A.3, VIII.A.4).

### b. Remaining Allowed Secured Claims of Fotinos

Fotinos has an outstanding secured claim in the amount of $553,980.23, plus § 506(b) fees, costs, and expenses. (*See* TE 46). Fotinos currently asserts a claim in excess of $600,000. (*See* 12/17/2019 Trial Tr. 111:15-16; DE 583 at Ex. B).

The Debtor's Plan proposes to treat this claim consistent with the *Stipulation Between the Debtor and Fotinos Properties, LLC Regarding Treatment of Fotinos' Secured Claim Against the Debtor, and Acceptance of Debtor's Plan of Reorganization* (DE 267), under which Fotinos would receive $575,000 plus allowed attorneys' fees and costs over a one-year period as follows: (1) $250,000 on the Effective Date; (2) 11 monthly interest-only payments at 6% per annum beginning 30 days after the Effective Date; and (3) the balance of $325,000 plus allowed attorneys' fees, costs, and unpaid accrued interest, payable one year from the Effective Date.

Under Cinco's Plan, Fotinos would be paid $600,000 on the Distribution Date, less any

---

Administrative Expense has been filed] on or before the Bar Date, the Administrative Expenses Bar Date, or the Rejection Claims Bar Date as applicable, but only to the extent that such Claim is identified in such proof of Claim in a liquidated and noncontingent amount, and

b. as to which no objection to the allowance of such Claim has been filed within any applicable time period fixed by the Cinco Plan or order of the Bankruptcy Court, or

c. as to which the order allowing such Claim has become final and non-appealable without any appeal, review, or other challenge of any kind to that order having been taken or being still timely; or

d. the Claim is scheduled in Debtor's or the Reorganized Debtor's schedule of Claims in an amount other than zero and not denoted as contingent, unliquidated, or disputed, and as to which no objection to the allowance of such Claim has been filed within the applicable time period fixed by the Cinco Plan or order of the Bankruptcy Court; or

e. the Claim is expressly allowed in a liquidated amount in this Plan, and as to which no objection to the allowance of such Claim has been filed within the applicable time period fixed by the Cinco Plan or order of the Bankruptcy Court; or

f. Except as provided in the Cinco Plan, if any Claim or the Creditor asserting such Claim is subject to any defense, setoff, counterclaim, recoupment, or other adverse Claim of any kind of Debtor, including, but not limited to, any pending appeal or unexpired right of appeal, that Claim will be deemed a Disputed Claim and it will not become an Allowed Claim unless and until all disputes are resolved or adjudicated fully and finally, and all appellate rights have been exhausted."

prior payments made.[19] (DE 588 at § II.B.5.)

### c. Allowed Secured Claims of the Rallis Creditor Group

The Rallis Creditor Group asserted a secured claim in the amount of $321,965.79 as of the Petition Date, which claim has been reduced by the post-petition sales of certain real property. (Proof of Claim 34-1; TE 20; TE 31). (*See* DE 583 at Ex. B).

The Debtor's Plan proposes to treat this claim consistent with the *Stipulation Between the Debtor and Rallis Creditors Allowing Claim and Modifying Plan Treatment of Class 7 Claim* (TE 31), under which the parties agree that the remaining claim amount as of October 24, 2018 was $154,513.85.[20] The parties further agree to the following treatment of such claim: (1) the Rallis Creditor Group would waive certain late fees; (2) post-petition attorneys' fees accrued between October 24, 2018 and the Effective Date would be paid on the Effective Date; (3) half of all other outstanding amounts would be paid on the Effective Date; (4) the Debtor would begin making interest-only payments at 12% per annum beginning thirty days from the Effective Date; and (5) the remainder of the claim would be paid in full within six months of the Effective Date. (TE 31).

Under Cinco's Plan, the Rallis Creditor Group's claim would be paid in full, in cash on the later of (i) the Distribution Date; or (ii) the date such claim becomes an Allowed Claim, or as otherwise agreed to by the parties or ordered by the Court. (DE 588 at § II.B.6; *see also* 4/9/2020 Trial Tr. 71:12-72:3).

### d. Allowed Secured Claims of France Terrace / Elevens

France Terrace asserted claims in the aggregate amount of $20,798.91 secured by 140 E Pastime Rd, Tucson, AZ and 144 E Pastime Rd, Tucson, AZ. (Proof of Claim 2-1). These claims were transferred to Elevens post-petition.[21] (DE 200).

Under the Debtor's Plan, if a sale of these properties were to close before the Effective

---

[19] During closing arguments, Cinco's counsel represented that to the extent Fotinos is legally entitled to a higher amount, that amount would be paid. (*See* 4/9/2020 Trial Tr. 71:12-72:7).

[20] This amount does not include any attorneys' fees to which the Rallis Creditor Group may be entitled. (*See* DE 583 at Ex. B).

[21] Mr. Alev testified that Elevens purchased France Terrace's claims so that he could participate in this case to assist Mr. Zarifi and his family. (12/17/2019 Trial Tr. 93:24-94:1, 94:10-12, 96:23-97:17).

Date, these claims would be paid from the resulting sale proceeds. (*See* TE 21 at § 3.9). Alternatively, the Debtor would: (1) pay half of the claim balance on the Effective Date; and (2) pay the remainder of the claims within six months of the Effective Date, with monthly interest-only payments at 6% per annum in the interim. (*See* TE 21 at § 3.9).

Under Cinco's Plan, these claims would be paid in full on the later of (i) the Distribution Date; or (ii) the date such claim becomes an Allowed Claim, or as otherwise agreed to by the parties or ordered by the Court. (DE 588 at § II.B.8).

### e. Non-Insider General Unsecured Claims

With the exception of the claim of Wissam Kaddoura ("Mr. Kaddoura"), all of the non-insider general unsecured claims in this case are disputed, contingent, and/or unliquidated.

The Debtor's Plan proposes to resolve all disputed non-insider general unsecured claims through litigation. To the extent allowed, non-insider general unsecured claims would be paid in full in no more than 36 monthly installments, with interest at the Plan Rate[22] to accrue from the Petition Date, with installment payments to begin upon the earlier of the time all claims of higher priority had been paid in full or one year after the Effective Date (as defined in the Debtor's Plan, the "Class 14 Commencement Date"). (TE 21 at § 3.14; DE 582). To the extent not allowed, disallowed, or otherwise resolved as of the Class 14 Commencement Date: (a) the Debtor would deposit cash into a disputed claim reserve in an amount determined by the Disbursing Agent to be necessary to enable the Debtor to make required plan payments if, and to the extent, the claim at issue were to be allowed; and (b) the holder of the claim would become entitled to payments under the Debtor's Plan upon allowance of the claim or any portion thereof. (TE 21 at § 5.2).

Cinco's Plan proposes to pay all non-insider general unsecured claims in full, in cash on the later of the Distribution Date, the date the claim becomes an Allowed Claim, or as otherwise agreed between the parties or ordered by the Court. (DE 587 at § II.B.11). Cinco has settled all

---

[22] The Plan Rate is defined as "an annual rate of interest equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the Effective Date, or such other rate of interest as the Bankruptcy Court determines to be necessary to satisfy any requirements for confirmation." (TE 21 at § 1.34). As of the time of the confirmation hearing, that rate was approximately 1.43%.

but one of the disputed, contingent, and/or unliquidated non-insider general unsecured claims,[23] which claims would be paid pursuant to the terms of the parties' settlement agreements on the Distribution Date, as discussed in more detail below. (*See* DE 285; DE 289; DE 293; DE 531).

### i.  Non-Insider General Unsecured Claims of RL Ventures

Ms. Nowak, as trustee of RL Ventures, has asserted a non-insider general unsecured claim in the amount of $168,837.03, which claim is unliquidated, disputed, and contingent upon the outcome of fraudulent transfer and preference litigation pending against the Debtor. (TE 37).

Under the Debtor's Plan, the Debtor would continue to litigate this disputed claim, and to the extent allowed, this claim would be paid as set forth in section III.A.3.e. above.

Cinco's Plan provides that RL Ventures would receive $160,000 on the Distribution Date in full satisfaction of its claim. This treatment is inconsistent with the *Settlement Stipulation and Plan Modification Concerning Trustee of RL Ventures, LLC* (DE 285), which provides that RL Ventures would receive $140,000.[24] This appears to be a clerical error in Cinco's Plan given Ms. Nowak's testimony that the settlement amount is $140,000 and given Cinco's post-trial brief, which indicates that the settlement amount is $140,000. (12/18/2019 Trial Tr. 196:22-25; DE 584 at 13).

### ii.  Non-Insider General Unsecured Claims of David Parri

Mr. Parri holds a judgment against Mr. Zarifi (the "Parri Judgment") and a charging order against the Debtor (the "Charging Order"). (TE 114; TE 137). Mr. Parri has asserted a general unsecured claim in the amount of $238,061.98 arising from the Debtor's alleged violation of the Charging Order. (TE 33).

Under the Debtor's Plan, the Debtor would litigate this disputed claim, and to the extent allowed, this claim would be paid as set forth in section III.A.3.e. above.

Under Cinco's Plan, this claim would be paid in accordance with the *Settlement Stipulation and Plan Modification Concerning David Parri Claim* (DE 289), pursuant to which Mr. Parri would be paid 90% of his filed claim amount on the Distribution Date, with the

---

[23] Cinco has not settled the disputed claim held by Visa in an unknown amount.

[24] Although this settlement proposes to modify the treatment of the RL Ventures' claims set forth in Cinco's Plan, Cinco modified its plan after this settlement was filed.

remaining balance owing on the Parri Judgment and certain court-imposed sanctions to be paid from any equity distributions to Mr. Zarifi.

### iii. Non-Insider General Unsecured Claims of Earth's Healing and the Saavedras

Earth's Healing and the Saavedras have asserted general unsecured claims in unknown amounts, which claims are unliquidated, disputed, and contingent upon the outcome of pending litigation in which the Debtor has asserted contract-related claims against Earth's Healing, and Earth's Healing and the Saavedras have asserted contract and tort-related counterclaims against the Debtor and Mr. Zarifi. (TE 44; Proof of Claim 32-2).

Under the Debtor's Plan, the Debtor would continue to litigate these claims, and to the extent allowed, these claims would be paid as set forth in section III.A.3.e. above.

Under Cinco's Plan, which incorporates the *Settlement Stipulation and Plan Modification Concerning Claims of Earth's Healing, Inc. and Vicky Puchi-Saavedra, Eduardo Saavedra* (DE 293), the claims of Earth's Healing and the Saavedras would be allowed as filed, but Earth's Healing and the Saavedras would receive no payment on their claims and the parties would execute mutual releases of all outstanding claims.

### iv. Non-Insider General Unsecured Claims of Stachowski/Stromberg

Stachowski/Stromberg have asserted a general unsecured claim in an unknown amount of no less than $1,000,000 arising from foundational and structural issues pertaining to their residence, which residence they purchased from the Debtor, and which residence they allege Skyline and/or Mr. Zarifi built. (*See* TE 187; DE 541).

Under the Debtor's Plan, the Debtor would continue to litigate this disputed claim, and to the extent allowed, this claim would be paid as set forth in section III.A.3.e. above.

Under Cinco's Plan, which incorporates the *Settlement Stipulation and Plan Modification Concerning Paula Stachowski and Daniel Stromberg Claims* (DE 531), $200,000 would be transferred into a repair escrow account to be drawn upon by Stachowski/Stromberg for payment of approved expenses incurred for the purpose of repairing their residence. Stachowski/Stromberg would bear the risk of any shortfall and any unused funds would be

released to the reorganized Debtor. (DE 531 at Agreement ¶ 2).

### v. Non-Insider General Unsecured Claims of Cinco

Cinco has asserted general unsecured claims in unknown amounts related to the Debtor's and/or Mr. Zarifi's alleged improper claims to interest under the Skyline Note, improper blocking of the continued development of the Rancho Soldados Property, and alleged dumping of trash on the Rancho Soldados Property. (*See* TE 42).

Under the Debtor's Plan, the Debtor would litigate these disputed claims, and to the extent allowed, these claims would be paid as set forth in section III.A.3.e. above, subject to a right of setoff.

Under Cinco's Plan, Cinco and the Debtor would be bound by the terms of the settlement incorporated into Cinco's Plan, pursuant to which: (1) Cinco would tender the unpaid principal balance of the Skyline Note to the Debtor in exchange for mutual releases, the release of all liens and claims on the Rancho Soldados Property, and the dismissal of all pending actions without prejudice; and (2) the Debtor would remove its and/or Mr. Zarifi's trash and construction debris from the Rancho Soldados Property, and agree that no further dumping would occur in the future. (DE 588 at IV.A).

### vi. Remaining Non-Insider General Unsecured Claims

In addition to the disputed claims discussed above, the Debtor originally scheduled Visa as holding an undisputed, noncontingent, liquidated general unsecured claim in the amount of $5,000. (DE 31 at 37). The Debtor amended its schedules to list Visa as holding a disputed general unsecured claim in an unknown amount, and Visa did not thereafter file a proof of claim. (DE 265 at 2). However, the Debtor did not amend its schedules to indicate that it was disputing Visa's claim until after the claims bar date, and Visa's claim has not been disallowed. (*See* DE 127; DE 265 at 2). Under either plan, Visa's claim would remain disputed.

Lastly, the Debtor scheduled Mr. Kaddoura as holding a non-insider general unsecured claim in the amount of $22,000, which claim is the only undisputed, noncontingent, and liquidated non-insider general unsecured claim in this case. (*See* DE 31; DE 265). Under the Debtor's Plan, Mr. Kaddoura's claim would be paid in full in 36 equal monthly installments

beginning on the Class 14 Commencement Date, with interest at the Plan Rate to accrue from the Petition Date. (*See* TE 21 at § 3.14; DE 582). Under Cinco's Plan, Mr. Kaddoura's claim would be paid in full on the later of (i) the Distribution Date; or (ii) the date such claim becomes an Allowed Claim, or at such other date and upon such other terms as may be agreed upon by the claimant and Cinco, or ordered by the Court, and at such times as are mutually agreeable to the respective parties. (DE 588 at § II.B.11).

### f. Insider General Unsecured Claims

This class consists of the insider general unsecured claims held by Sami Zarifi 14 in the amount of $100,000; Linda Zarifi in the amount of $60,000; and Saira Markovic in the amount of $70,000.

Under the Debtor's Plan, these claims would be paid in full, with interest at the Plan Rate to accrue from the Petition Date, upon the earlier of the time all claims of a higher priority had been paid in full or five years after the Effective Date. (TE 21 at § 3.15; DE 582).

Under Cinco's Plan, these claims would be paid in full, in cash on the later of (i) the Distribution Date; or (ii) the date such claim becomes an Allowed Claim, or at such other date and upon such other terms as may be agreed upon by the claimant and Cinco, or ordered by the Court, and at such times as are mutually agreeable to the respective parties. (DE 588 at § II.B.12).

### g. Equity Security Holders

Mr. Zarifi is the sole equity security holder with a 100% ownership in the Debtor.

Under the Debtor's Plan, Mr. Zarifi would retain his membership interest and receive distributions subordinate to all classes of a higher priority. (TE 21 at § 3.16).

Cinco's Plan proposes to leave Mr. Zarifi's ownership interest unimpaired. (DE 588 at § II.B.13).

### B. The Votes

The remaining secured classes and the insider general unsecured class voted to accept the Debtor's Plan and to reject Cinco's Plan.[25] (DE 304). The non-insider general unsecured class

_____

[25] The classes comprised of Fotinos' and the Rallis Creditor Group's secured claims voted to reject

voted to accept Cinco's Plan and to reject the Debtor's Plan.[26] (DE 304).

## IV.    <u>Legal Analysis & Conclusions of Law</u>

The requirements for confirmation of a chapter 11 plan are set forth in §§ 1129(a)(1)-(16). If all the provisions of § 1129(a) are satisfied with the exception of § 1129(a)(8), a plan can nevertheless be confirmed if it satisfies § 1129(b). The plan proponent bears the burden of establishing that its plan satisfies the confirmation requirements by a preponderance of the evidence. *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 653 (9th Cir. 1997). In the event the Court finds that two or more plans are confirmable, the Court may only confirm one such plan. 11 U.S.C. § 1129(c).

Mr. Parri, Ms. Nowak, Earth's Healing, the Saavedras, and Cinco have objected to confirmation of the Debtor's Plan on the basis that: (1) the Debtor has failed to comply with the Code and Rules[27] as required by § 1129(a)(2); (2) the Debtor's Plan has not been proposed in good faith as required by § 1129(a)(3); (3) Mr. Zarifi's continued management of the Debtor would not be in the best interests of creditors or public policy in violation of § 1129(a)(5); and (4) the Debtor's Plan is not fair and equitable, and discriminates against non-accepting classes in violation of § 1129(b).[28]

Elevens, the Rallis Creditor Group, Sami Zarifi 14, and the Debtor have objected to

Cinco's Plan at least in part because the stipulations they reached with the Debtor required them to reject Cinco's Plan. (12/17/2019 Trial Tr. 117:3-6, 117:23-118:7; 12/18/2019 Trial Tr. 11:12-12:17; DE 267 at ¶ 19; TE 31 at ¶ 15).

[26] The Court allowed Mr. Parri's proof of claim for voting purposes, and Mr. Parri, as part of the general non-insider unsecured creditor class, voted to accept Cinco's Plan. (DE 321; DE 304). Additionally, Cinco's Plan separately classifies the claims of RL Ventures, and Ms. Nowak, on behalf of RL Ventures, voted to accept Cinco's Plan. There is no dispute that this class gives Cinco an impaired accepting class. (4/9/2020 Trial Tr. 40:4-23).

Additionally, the class consisting of the allowed secured claims held by the Rancho Vistoso Homeowners Association (the "Rancho Vistoso Claims") voted to accept both plans; however, the Rancho Vistoso Claims were paid in full post-petition from sale proceeds.

[27] References to "Rules" are references to the Federal Rules of Bankruptcy Procedure.

[28] Certain objectors to the Debtor's Plan also originally raised §§ 1129(a)(1) and (a)(7) objections., because these objections were not raised in the *Second Amended Joint Pre-Trial Statement* (DE 534), at trial, or in the post-trial briefing, the Court deems the §§ 1129(a)(1) and (a)(7) objections to the Debtor's Plan waived. That being said, given that the Court has an independent duty to evaluate whether a plan satisfies the requirements for confirmation, the Court finds that the Debtor's Plan complies in all material ways with the applicable provisions of the Code, satisfying § 1129(a)(1), and satisfies the best interests of creditors test in § 1129(a)(7).

confirmation of Cinco's Plan on the basis that: (1) Cinco's Plan does not comply with the Code as required by § 1129(a)(1); (2) Cinco has not complied with the Code in violation of § 1129(a)(2); (3) Cinco's Plan was not proposed in good faith in violation of § 1129(a)(3); (4) Cinco's Plan does not satisfy the best interests of creditors test in § 1129(a)(7); (5) Cinco's Plan is not feasible as required by § 1129(a)(11); and (6) Cinco Plan is not fair and equitable, and is discriminatory in violation of § 1129(b).[29]

### A.    Section 1129(a)(1) – Plan Compliance With Code

Pursuant to § 1129(a)(1), the Court can only confirm a plan if it complies with the applicable provisions of the Code.

The objectors to Cinco's Plan argue that Cinco's Plan proposes settlements that it does not have standing to propose, and that in any event, the settlements as proposed are not fair or reasonable, in violation of the Code and § 1129(a)(1).

### 1.    **Standing**

As noted above, the Debtor's exclusive right to file a plan was terminated in September 2018. Such termination allowed creditors and other parties in interest to file competing plans. *See* 11 U.S.C. § 1121. Cinco filed its plan soon thereafter.

Cinco filed its claim in this case for an unspecified amount based upon alleged damages stemming from the Debtor's and/or Mr. Zarifi's alleged improper claims to interest on the Skyline Note, alleged blocking of the continued development of the Rancho Soldados Property, and alleged dumping of trash and other debris on the Rancho Soldados Property. (TE 42). The Debtor has objected to Cinco's proof of claim, but given that there is a proposed settlement of Cinco's claim in Cinco's Plan, the underlying claim dispute has not been adjudicated by this Court. (*See* DE 435; DE 450; DE 473).

The Debtor nevertheless argues that Cinco is not a creditor, or party in interest because Cinco's alleged claims only implicate Mr. Zarifi in his individual capacity. Cinco, however, maintains that alter ego liability binds the Debtor, or in the alternative, that the Debtor is bound

---

[29] The Debtor also originally objected to Cinco's Plan on the basis that no impaired class had voted to accept the plan in violation of § 1129(a)(10). (DE 300). Debtor's counsel has since conceded, and the Court finds that Cinco's Plan satisfies § 1129(a)(10). (*See* 4/10/2020 Trial Tr. 40:4-23).

by the conduct of Mr. Zarifi as its agent.

### a. Party in Interest

Who constitutes a "party in interest" with standing to propose a chapter 11 plan is partially defined in § 1121 as "including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee . . . ." *See* 11 U.S.C. § 1121(c); *see also In re Rook Broad. of Idaho, Inc.*, 154 B.R. 970, 972 (Bankr. D. Idaho 1993). However, the list of parties in interest set forth in § 1121 "is not limiting, but is merely representative." *In re Chandler Airpark Joint Venture I*, 163 B.R. 566, 569 (Bankr. D. Ariz. 1992); *see also* 11 U.S.C. § 102(3) (pursuant to which the word "including," as used in the Code, is "not limiting").

Ultimately, the concept of who is a party in interest under the Code is a broad one "designed to give a [c]ourt great latitude to insure fair representation of all constituencies impacted in any significant way by a [c]hapter 11 case." *In re Chandler Airpark Joint Venture I*, 163 B.R. at 569 (quoting *In re Johns-Manville Corp.*, 36 B.R. 743, 754 (Bankr. S.D.N.Y. 1984)).

In this case, Cinco is clearly a party in interest. Cinco will be significantly impacted by this case given that Skyline asserts that Cinco is its largest debtor, given that Cinco asserts a number of affirmative defenses to Skyline's claims for payment, and given that post-confirmation management of the reorganized Debtor could directly impact Cinco.

### b. Alter Ego Theory

The alter ego doctrine is often invoked in order to hold equity holders liable for the debts or conduct of the entities in which they hold an interest. *In re Singh*, No. 6:14-BK-19919-SC, 2019 WL 1231146, at *6 (B.A.P. 9th Cir. Mar. 14, 2019). "The alter-ego doctrine attempts to prevent fraud, misuse, and injustice arising from misuse of the corporate form of organization." *Butler Law Firm, PLC v. Higgins*, 243 Ariz. 456, 462, 410 P.3d 1223, 1229 (Ariz. 2018) (internal quotations and citation omitted). "Where corporate and individual affairs are badly intermingled and it would be unjust to recognize the distinction between individuals and corporations, courts will hold the individuals liable for corporate debts and vice versa." *In re*

*Tobin*, 258 B.R. 199, 204 (B.A.P. 9th Cir. 2001) (quoting 4 Daniel R. Cowans, *Bankruptcy Law and Practice*, § 16.8, p. 147 (7th ed. 1998)).

"Although Arizona courts do not appear to have explicitly applied the reverse corporate veil piercing doctrine, federal bankruptcy courts applying Arizona law have recognized the availability of the doctrine." *Barba v. Seung Heun Lee*, No. CV 09-1115-PHX-SRB, 2009 WL 8747368, at *6 (D. Ariz. Nov. 4, 2009) (citing *In re Destiny Enterprises, LLC*, No. 2-07-bk-00542, 2008 WL 5047808, at *3 (Bankr. D. Ariz. July 14, 2008) and *In re Don's Making Money, LLP,* No. 99-07757-PHX-CGC, 2007 WL 2784351, at *3 (Bankr. D. Ariz. Sept. 24, 2007)).

"As in a direct corporate veil piercing case, courts will apply the doctrine in reverse to reach the assets of an alter ego corporation to 'prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime.'" *Id.* (quoting *Portfolio Fin. Servicing Co. ex rel. Jacom Computer Servs. v. Sharemax.com, Inc.*, 334 F. Supp. 2d 620, 626 (D.N.J. 2004)). "Courts find the doctrine particularly applicable when the owner or principal has used multiple entities 'to hide assets or secretly to conduct business' to avoid liability." *Id.* (quoting *Portfolio Fin. Servicing Co.*, 334 F. Supp. 2d at 626).

Bankruptcy courts apply the law of the forum state in order to determine whether an entity is the alter ego of an individual. *See Towe Antique Ford Found. v. I.R.S.*, 999 F.2d 1387, 1391 (9th Cir. 1993); *In re Brace*, No. 6:11-AP-02053-SY, 2017 WL 1025215, at *7 (B.A.P. 9th Cir. Mar. 15, 2017). Under Arizona law, alter ego status exists if: (1) "there is such a unity of interest and ownership that the separate personalities of the corporation and the owners cease to exist[;]" and (2) "to observe the corporation would work an injustice." *Ize Nantan Bagowa, Ltd. v. Scalia*, 118 Ariz. 439, 442, 577 P.2d 725, 728 (Ariz. Ct. App. 1978); *see also Gatecliff v. Great Republic Life Ins. Co.*, 170 Ariz. 34, 37, 821 P.2d 725, 728 (Ariz. 1991); *Keg Restaurants Arizona, Inc. v. Jones*, 240 Ariz. 64, 73, 375 P.3d 1173, 1182 (Ariz. Ct. App. 2016).

Arizona case law has identified the following factors, among others, as being relevant to the unity of ownership prong of the alter ego test: (1) failure to maintain corporate formalities; (2) financing or payment of one's expenses by the other; (3) lack of knowledge of a separate

corporate existence on the part of the litigant pursuing an alter-ego theory; (4) commingling of personal and corporate funds; and (5) diversion of corporate property for equity holders' personal uses. *See Gatecliff*, 170 Ariz. at 37, 821 P.2d at 728; *Deutsche Credit Corp. v. Case Power & Equip. Co.*, 179 Ariz. 155, 160-61, 876 P.2d 1190, 1195-96 (Ariz. Ct. App. 1994).

The second prong of the alter ego analysis requires a court to evaluate whether justice necessitates recognizing substance over corporate form. *See Youngren v. Rezzonico*, 25 Ariz. App. 304, 306, 543 P.2d 142, 144 (Ariz. Ct. App. 1975). "Injustice falls within the realm of equity[,]" and "[e]quity is reluctant to permit a wrong to be suffered without remedy." *All Custom Exteriors, Inc. v. Bilyea*, No. 1 CA-CV 10-0702, 2011 WL 5964528, at *6 (Ariz. Ct. App. Nov. 29, 2011) (quoting *Youngren*, 25 Ariz. App. at 306, 543 P.2d at 144). Equity "will not sanction an unconscionable result merely because it may have been brought about by means which simulate legality." *Id.*

In this case, the following facts are relevant to the Court's analysis of the unity of control prong of the alter ego test:

- Mr. Zarifi has been the sole owner, manager, and decision-maker of the Debtor since approximately 2013. (12/18/2019 Trial Tr. 80:12-23; *see also* DE 420 at ¶ 2; 12/17/2019 Trial Tr. 179:19-180:4).

- The Debtor's principal place of business is Mr. Zarifi's personal residence. (1/16/2020 Trial Tr. 103:6-104:10; *see also* TE 13).

- The Debtor pays, or has paid, including post-petition, a portion of Mr. Zarifi's mortgage on his personal residence.[30] (12/17/2019 Trial Tr. 50:14-51:23; DE 420 at ¶¶ 89-90).

- Mr. Zarifi has paid certain of the Debtor's expenses during the pendency of this case. (*See, e.g.,* DE 376 at 3 n.1).

---

[30] For purposes of this alter ego analysis, it is irrelevant that the IRS authorized the Debtor to deduct a portion of Mr. Zarifi's personal mortgage payment as a business expense.

- Mr. Zarifi has allowed a relative to use certain of the Debtor's real property rent-free in payment of what Mr. Zarifi feels is a personal debt he owes that relative. (12/18/2019 Trial Tr. 77:14-78:25).

- Mr. Sheafe, Ms. Puchi-Saavedra, and Mr. Parri testified that based on their interactions and dealings with Mr. Zarifi, they understood Mr. Zarifi and the Debtor to be one and the same.[31] (1/23/2020 Trial Tr. 82:22-24, 146:19-147:2, 148:16-17; 2/6/2020 Trial Tr. 172:1-3, 179:22-24).

- The Arizona Superior Court found that Mr. Zarifi treated the Debtor's bank account as his own personal account, and improperly used the Debtor's assets for his own personal uses. (TE 33 at 4-8).

Given these facts, and the totality of the evidence presented, it is the determination of the Court that in this case, the unity of control prong of the alter ego test is met. The Court further finds that it would be inequitable to allow Mr. Zarifi to shield Skyline from liability to the detriment of creditors when he finds it convenient to do so; thus, the fairness component of the alter ego test is also satisfied.

Based upon the foregoing, Cinco has asserted a claim against the Debtor, and Cinco could be significantly impacted by these proceedings. Accordingly, it is the determination of the Court that Cinco is a creditor and party in interest within the meaning of § 1121, and as such, Cinco has standing to propose Cinco's Plan.

### 2. **The Proposed Settlements**

Pursuant to § 1123(b)(3)(A), a plan may "provide for the settlement or adjustment of any claim or interest belonging to the debtor or to the estate[.]" Although the Debtor contends that only a trustee or debtor-in-possession has standing to propose a compromise, citing Rule 9019, "any conflict between the Bankruptcy Code and the Bankruptcy Rules must be settled in favor of the Code." *In re Pac. Atl. Trading Co.*, 33 F.3d 1064, 1066 (9th Cir. 1994).

---

[31] The Court will also note that although they are not persons pursuing an alter ego theory in this case, Mr. Alev conflated the Debtor with Mr. Zarifi during testimony and Mr. Carlier testified that he understood there to be no difference between Mr. Zarifi and the Debtor such that what Mr. Zarifi agreed to, the Debtor agreed to. (12/17/2019 Trial Tr. 98:11-12; DE 452 at ¶ 25).

For purposes of § 1129(a)(1), the remaining issue is whether the settlements proposed in Cinco's Plan are fair and equitable as required by the Code. A plan proponent has the burden of establishing by a preponderance of the evidence that the settlements proposed in its plan are "reasonable, adequate, fair and equitable." *In re WCI Cable, Inc.*, 282 B.R. 457, 469 (Bankr. D. Or. 2002).

When a court is determining whether a proposed settlement is fair and equitable, the court must consider:

> (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; [and] (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*In re A & C Props.*, 784 F.2d 1377, 1381 (9th Cir. 1986) (quoting *In re Flight Transp. Corp. Sec. Litig.*, 730 F.2d 1128, 1135 (8th Cir. 1984)).

No one of the above factors is dispositive; rather, the "factors should be considered as a whole to determine whether the settlement compares favorably with the expected rewards of litigation." *In re Esterlina Vineyards & Winery, LLC*, No. BAP NC-16-1428-TABS, 2018 WL 1354331, at *8 (B.A.P. 9th Cir. Mar. 13, 2018), *aff'd,* 71 F. App'x 680 (9th Cir. 2019) (quoting *Greif & Co. v. Shapiro* (*In re Western Funding Inc.*), 550 B.R. 841, 851 (B.A.P. 9th Cir. 2016)). Because a court has discretion as to how much weight to give to each of the factors, "any one factor may have weight in isolation that justifies [a] settlement." *In re Bondanelli*, No. BAP CC-19-1175-TaFS, 2020 WL 1304140, at *2 (B.A.P. 9th Cir. Mar. 18, 2020).

"The law favors compromise and not litigation for its own sake[.]" *In re A & C Props.*, 784 F.2d at 1381 (9th Cir. 1986). "[W]hen assessing a compromise, courts . . . canvass the issues and need not rule on disputed facts and questions of law." *In re Bondanelli*, 2020 WL 1304140, at *2. "If the court were required to do more, there would be no point in compromising; the parties might as well try the case." *Id.*

### a. Settlement of RL Ventures Claims

Pre-petition, the Debtor and RL Ventures entered into a joint venture. (*See* TE 37; DE 426 at ¶ 7; 12/18/2019 Trial Tr. 199:20-200:19).[32] Thereafter, RL Ventures filed for bankruptcy and Ms. Nowak was appointed the chapter 7 trustee. (*See* DE 426 at ¶¶ 2, 6).

In the RL Ventures case, Ms. Nowak commenced an adversary action against Skyline alleging that transfers in the amount of $212,228 were avoidable as fraudulent transfers pursuant to §§ 548, 550 and 551 and that $157,228 of this amount was also avoidable as preferential transfers pursuant to §§ 547, 550 and 551. (TE 37 at Ex. A; *see also* DE 426 at ¶¶ 3, 16, 17). Ms. Nowak also sought turnover pursuant to §§ 541 and 542. (TE 37 at Ex. A). The judge presiding over the RL Ventures case denied Ms. Nowak's motion for partial summary judgment on the basis that there are disputed issues of material fact that require a trial. (DE 426 at ¶ 28). Ms. Nowak filed a proof of claim in this case in the amount of $168,837.03. (TE 37). Cinco and Ms. Nowak agreed to settle RL Ventures' claims for $140,000, as set forth in the *Settlement Stipulation and Plan Modification Concerning Trustee of RL Ventures, LLC* (DE 285; *See* DE 426). (DE 588 at § II.B.10.). Ms. Nowak and Mr. Sheafe both testified that they believe the proposed settlement is a fair compromise that would allow the parties to avoid the time and expense of litigation, the cost of which would reduce the value of both this estate and the RL Ventures' estate. (*See* 12/18/2019 Trial Tr. 201:5-203:15; DE 563 at ¶¶ 41-43).

### i. <u>Probability of Success in Litigation</u>

The Debtor objected to the proof of claim filed by Ms. Nowak on the basis that: (1) the alleged preferential transfers accrued outside the 90-day lookback period of § 547(b)(4)(A) and Ms. Nowak cannot prove that Skyline was an insider for purposes of the one-year lookback period; and 2) the fraudulent transfer claims failed based on Ms. Nowak's statements that the funds were made to reimburse Skyline for funds advanced. Skyline objects to the proposed settlement as unreasonable on the same grounds, and wants to litigate the claim.

The parties ignore the fact that the issue is not whether Skyline was an insider of RL

---

[32] The Court will also take judicial notice of the *Declaration of Ahmad Zarifi* filed at DE 58, Ex. 2 in *Nowak v. Skyline LLC, et al* (4:16-ap-00512-SHG), in which Mr. Zarifi admits that RL Ventures and Skyline entered into a joint venture.

Ventures. Skyline has conceded that RL Ventures and Skyline were involved in a joint venture, so the issue is whether the parties to this joint venture were insiders. Ultimately, neither the Debtor nor Mr. Zarifi has provided any persuasive evidence to support a finding that the proposed settlement of the RL Ventures claim is unreasonable.

## ii. Collectability

Even if the Debtor were to be successful on the merits, there would be nothing for the Debtor to collect. The Debtor is a defendant in this matter. The only party at risk of encountering collectability issues is Ms. Nowak, in the event the Debtor has insufficient funds on hand to pay any claim that is ultimately allowed.

## iii. Complexity, Expense, Inconvenience, and Delay Attendant to Continued Litigation

As discussed above, the litigation in the RL Ventures case is at the trial stage. Trials are expensive and there would necessarily be a delay attendant to the continued litigation of this claim. Such delay would be detrimental to creditors in the RL Ventures case, and Ms. Nowak estimated the cost of such litigation to be $30,000 to $50,000. (12/18/2019 Trial Tr. 203:12-15).

## iv. The Interest of Creditors

This settlement would have no negative impact on secured or unsecured creditors holding allowed claims, who would all receive prompt payment in full or in stipulated amounts under Cinco's Plan. Further, it is in the best interests of those holding unliquidated, contingent, and/or disputed claims and insider claims that this claim be settled in order to give such claim holders reasonable assurance that there will be sufficient funds to pay their claims to the extent allowed. The only party that could potentially be negatively impacted by this settlement is Mr. Zarifi.

It is, however, clear that this was a complicated transaction, which will be costly to litigate. As stated above, compromise is favored over litigation for its own sake. Ultimately, all of the *In re A & C Properties* factors weigh in favor of settlement of the RL Ventures claim, and the Court finds that the settlement terms and amount are fair and equitable under the circumstances.

### b.    Settlement of Parri Claims

In 2015, Mr. Parri obtained: (1) the Parri Judgment in the amount of $408,781.80, together with interest at the legal rate,[33] against Mr. Zarifi and his wife, none of which amount, at least as of the time of trial, had been paid; and (2) the Charging Order against the Debtor. (TE 114; TE 137; 12/18/2019 Trial Tr. 58:10-25). The Charging Order against the Debtor requires payment of the Judgment, plus accrued interest thereon, before any equity distribution can be made by Skyline to Mr. Zarifi. (TE 137). Mr. Parri filed a claim in this case alleging that the Debtor violated the Charging Order and requesting damages in the amount of no less than $238,061.98. (TE 33).

Cinco and Mr. Parri have agreed to a compromise under which Mr. Parri would be paid 90% of his filed claim on the Distribution Date, which would be applied against the amount outstanding under the Parri Judgment, and would receive the remaining balance on the Parri Judgment as well as unpaid sanctions in the approximate amount of $14,740 before Mr. Zarifi would receive any distributions from the Debtor. (DE 289).

### i.    <u>Probability of Success in Litigation</u>

Although the Debtor has objected to this claim on the basis that Mr. Parri does not hold a judgment against the Debtor, and on the basis that Mr. Parri's claim for violation of the Charging Order is time-barred and/or barred by preclusion doctrines, the Pima County Superior Court found that Mr. Parri had "made a prima facie showing that [Mr.] Zarifi [had] failed to comply with the Court's Charging Order." (TE 36). Further, even if the Debtor were to successfully defend against Mr. Parri's claim that the Debtor has violated the Charging Order, the Charging Order would remain in full force and effect, and Mr. Parri would ultimately be entitled to payment on the Judgment, as long as the Debtor remains solvent, before any equity distributions could be paid to Mr. Zarifi.

### ii.    <u>Collectability</u>

The only dispute is whether Mr. Zarifi violated the Charging Order. The Debtor remains

---

[33] The proof of claim asserts that interest accrues at a rate of 5.79% per annum, but according to the *Settlement Stipulation and Plan Modification Concerning David Parri Claims* (DE 289), interest accrues at a rate of 4.25% per annum. (*Compare* TE 33 *with* DE 289).

subject to the Charging Order. The Debtor is not affected by this factor.

### iii. **Complexity, Expense, Inconvenience, and Delay Attendant to Continued Litigation**

As stated above, the Parri Judgment and Charging Order are final and enforceable. The remaining litigation pertains to whether Mr. Zarifi violated the Charging Order. To the extent Skyline is involved in such litigation, it would be costly and time-consuming, and the Debtor would likely have no means of recouping its attorneys' fees or costs, making a net loss a likely outcome. The proposed settlement would resolve all litigation and avoid any further delay or expense. It would also avoid the continued accrual of interest on the amount of the Judgment paid on the Distribution Date.

### iv. **The Interest of Creditors**

This settlement would have no negative impact on the holders of allowed secured or unsecured claims, who would all receive prompt payment in full or in agreed-upon amounts under Cinco's Plan. Further, this settlement would have no negative impact on Mr. Zarifi's equity interest given that as long as the Debtor is solvent, the Parri Judgment will have to be paid in full before Mr. Zarifi receives any distribution from Skyline.

The testimony of Mr. Zarifi did not refute the validity of the Charging Order and there is no legitimate reason for the estate to incur additional legal expenses to dispute Mr. Parri's claim. (*See* 12/18/2019 Trial Tr. 65:1-9).

All of the *In re A & C Properties* factors weigh in favor of settlement of Mr. Parri's claim, and the Court finds that the settlement terms are fair and equitable under the circumstances.

### c. **Settlement of Earth's Healing and the Saavedras' Claims**

Prior to the Petition Date, the Debtor, Mr. Zarifi, Earth's Healing, and the Saavedras were engaged in litigation in state court, which litigation was stayed by the bankruptcy filing. (DE 429 at ¶¶ 5-6). Earth's Healing and the Saavedras filed general unsecured proofs of claim in this case for unknown amounts based on the pending litigation.

The Debtor commenced the state court action against Earth's Healing and the Saavedras, alleging breach of contract-related claims arising from two notes (collectively the "EH & S

Notes," and individually the "First EH & S Note" (TE 109) and the "Second EH & S Note" (TE 110)), each of which was signed by Earth's Healing and Ms. Puchi-Saavadra, as maker, in favor of the Debtor, in the principal amount of $50,000. (DE 429 at ¶ 9; *see also* TE 109; TE 110).

Under the First EH & S Note, dated March 23, 2012, payments of principal and interest, at the rate of 33% per annum, were conditioned upon the maker obtaining a medical marijuana dispensary registration within a specific period of time. (TE 109). In the event the condition was not met, the First EH & S Note would terminate and be of no force and effect. (TE 109). Ms. Puchi-Saavedra testified that the condition was met, and that she made payments totaling $20,000, but ceased making payments after Mr. Zarifi, acting in the interests of the Debtor and in his capacity as the Debtor's sole member and manager, assaulted her. (DE 429 at ¶¶ 20-22, 25; TE 178; 1/23/2020 Trial Tr. 65:19-66:6).

Ms. Puchi-Saavedra contends that the consideration for the execution of the Second EH & S Note, which was dated April 4, 2013, was to be "items and services that Mr. Zarifi promised would be provided to Earth's Healing in the form of improvements and fixtures for the Dispensary, and for money to be used to construct a 3,000 square foot grow room, which was never built." (DE 429 at ¶ 11). Payments under the Second EH & S Note were to commence 6 months after the opening of the dispensary, with interest to accrue at the rate of 33%. (TE 110) Ms. Puchi-Saavedra testified that she did not receive any funds under the Second EH & S Note. (1/23/2020 Trial Tr. 68:14-16). This testimony was not controverted. It is also her testimony that she was induced by a false representation of Mr. Zarifi into signing the Second EH & S Note. (DE 429 at ¶ 14).

Subsequent to the maturity of the EH & S Notes, Mr. Zarifi pled guilty to assaulting Ms. Puchi-Saavedra, and Ms. Puchi-Saavedra obtained an injunction against Mr. Zarifi to prevent further harassment arising from the assault and/or other business deals between the parties. (*See* TE 172; 12/18/2019 Trial Tr. 104:12-109:2; 1/23/2020 Trial Tr. 91:5-25).

In the pending state court action, Earth's Healing and the Saavedras asserted counterclaims against the Debtor and Mr. Zarifi for damages arising from breach of contract, negligent misrepresentation, and intentional misrepresentation and/or fraud claims pertaining to

the EH & S Notes, as well as for defamation, defamation per se, battery, assault, and intentional and negligent emotional distress. (TE 44). It is Ms. Puchi-Saavedra's testimony that her damage claims would far exceed any amount owed on the EH & S Notes.[34] (1/23/2020 Trial Tr. 84:19-22).

The Debtor and Mr. Zarifi dispute all of the claims asserted by Earth's Healing and the Saavedras on the basis that the claims are asserted against Mr. Zarifi individually, are factually unsupported, and/or are barred by the economic loss rule. Under the Debtor's Plan, the Debtor would continue to litigate its claims and defend against the counterclaims.

Under Cinco's Plan, the parties would execute mutual releases and Earth's Healing and the Saavedras would waive any right to distribution under Cinco's Plan. (DE 293).

### i. Probability of Success in Litigation

There are a number of contract and tort-based claims and counterclaims involved in the underlying litigation. Mr. Zarifi's assertion that the allegations relate primarily to him and not Skyline is not well-taken. Mr. Zarifi's testimony reflects that he considered the EH & S Notes to be "his promissory notes" and that he would not accept payment from Earth's Healing on the basis that such funds were income from the marijuana industry. (12/18/2020 Trial Tr. 109:15-23). Further, Mr. Zarifi pled guilty to assaulting Ms. Puchi-Saavedra. His testimony that he did so to avoid the cost and hassle of trial, but that in reality there was no assault, is not credible. Ultimately, the Debtor's likelihood of success in litigation is far from certain. *See also Flagstaff Affordable Hous. Ltd. P'ship v. Design All., Inc.*, 223 Ariz. 320, 323, 223 P.3d 664, 667 (Ariz. 2010) (recognizing that the economic loss rule would not prohibit tort recovery where the economic loss had been accompanied by physical injury to persons or property).

### ii. Collectability

No testimony or evidence was provided as to whether the Debtor would have any difficulty collecting on any potential judgment in its favor.

---

[34] Ms. Puchi-Saavedra also testified that she would amend her complaint to assert punitive damages and vicarious liability against Skyline if litigation were to continue. (1/23/2020 Trial Tr. 92:4-10).

### iii. <u>**Complexity, Expense, Inconvenience, and Delay Attendant to Continued Litigation**</u>

As noted above, litigation is expensive, and in this case, the litigation at issue is in its early stages, meaning that delays attendant to continued litigation would be likely. No evidence was presented as to the anticipated cost of such litigation.

### iv. <u>**The Interest of Creditors**</u>

This settlement would have no negative impact on secured or unsecured creditors holding allowed claims, who would all receive prompt payment in full or in stipulated amounts under Cinco's Plan. Further, it is in the best interest of those holding unliquidated, contingent, and/or disputed claims and insider claims that these claims be settled in order to give such claim holders reasonable assurance that there will be sufficient funds to pay their claims to the extent allowed. The only party that could potentially be negatively impacted by this settlement is Mr. Zarifi. However, given the unknown cost of continued litigation, and the evidence presented, it is reasonably foreseeable that the Debtor could end up owing Earth's Healing and Ms. Puchi-Saavedra in excess of any amount due on the EH & S Notes. Further, even if the Debtor were to be successful, the Debtor has acknowledged that such award would be offset by any amounts awarded to Earth's Healing and/or the Saavedras.

Ultimately, all of the *In re A & C Properties* factors are neutral or weigh in favor of settlement of the Earth's Healing and the Saavedras' claims, and the Court finds that the settlement terms are fair and equitable under the circumstances.

### d. **Settlement of Stachowski/Stromberg Claims**

Stachowski/Stromberg purchased a house from the Debtor within the Rancho Soldados Property, specifically 11965 E. Placita Rancho Soldados (Rancho Soldados Lot 6), in or about February 2016. (*See* TE 195; DE 541 at ¶ 3). When Stachowski/Stromberg moved into the residence, Mr. Zarifi delivered a handwritten letter to them on behalf of the Debtor regarding repairs that the Debtor would make to the home. (TE 187, Pt. 2 at 17; DE 541 at ¶ 4-5; *see also* 1/23/2020 Trial Tr. 124:11-17, 137:20-24). Stachowski/Stromberg allege that, since they moved into the residence, severe issues with the foundation and structure of the home have emerged.

(DE 541 at ¶ 6; 1/23/2020 Trial Tr. 114:4-6).

Ms. Stachowski testified that she and Mr. Stromberg filed a complaint against the Debtor with the Arizona Registrar of Contractors (the "ROC"), but acknowledged that their claim was dismissed because the ROC maintained that California Homes, LLC ("California Homes") was the licensed contractor of the home. (DE 541 at ¶¶ 7-8; 1/23/2020 Trial Tr. 105:2-4). Ms. Stachowski further testified that Mr. Zarifi told her he was the builder of the home. (DE 541 at ¶ 5). It is Stachowski/Stromberg's position that California Homes was the contractor in name only, and that Mr. Zarifi and/or the Debtor were the de facto builder, contractor, and seller of the home.[35] (DE 541 at ¶ 9). Stachowski/Stromberg filed their claim in this case for damages in an unknown amount. Stachowski/Stromberg's claim is based on theories of negligence, negligent construction, breach of contract, negligent and/or intentional misrepresentation, failure to disclose, negligent design, and breach of warranty with regard to the construction and sale of the residence to them, and Stachowski/Stromberg assert that damages may exceed $1 million.

The Debtor contends that Stachowski/Stromberg's claims are meritless based upon, among other things, the ROC's findings and dismissal of the ROC complaint, lack of privity, inapplicability of the implied warranty of habitability, the express terms of the purchase agreement, and Stachowski/Stromberg's written agreement that all repairs agreed to in the purchase agreement and/or escrow instructions had been satisfied or completed.

Mr. Zarifi has acknowledged that he was personally responsible for the structural design of the home, but maintains that California Homes was the builder of the home; thus, it is his position that neither he nor the Debtor is liable for construction defects. (1/16/2020 Trial Tr. 80:1-82:5). Mr. Zarifi did, however, testify that he would be responsible for any structural failure. (1/16/2020 Trial Tr. 81:8-18).

Cinco's Plan proposes to establish a $200,000 fund for repairs to the Stachowski/Stromberg residence in satisfaction of the Stachowski/Stromberg claims. The

---

[35] Mr. Sheafe also testified that he understood Mr. Zarifi to be the builder of the Stachowski/Stromberg house, and that Mr. Zarifi had encroached on a neighboring lot during the building process. (2/6/2020 Trial Tr. 10:6-20, 70:24-71:3, 71:6-73:25).

settlement provides that $200,000 would be deposited into an interest bearing escrow account and provides a mechanism for the release of funds based upon escrow instructions and the submission of invoices which would require the consent of Stachowski/Stromberg, the Debtor, and Cinco. Mr. Sheafe testified that he is the person who proposed the dollar amount based upon his experience in building homes. (2/6/2020 Trial Tr. 74:11-13).

### i. **Probability of Success in Litigation**

At this juncture, there are a number of facts in dispute and this claim litigation is in its infancy. The Debtor's probability of success in this litigation is far from certain.

In reviewing the evidence related to this claim the Court notes that although the Debtor argues that the sale contract waived any claims for alleged defects that were not identified and remedied prior to closing, the sale contract also provides that "Builder Warranties [were] provided during inspection period," and further provides that certain warranties survive[d] closing, including nondisclosure of any material latent defects. (TE 187). Additionally, at and after the time of closing, the testimony reflects that repairs continued to be made on behalf of Skyline. (*See* TE 187 at 56; 1/23/2020 Trial Tr. 124:18-125:2, 125:9-126:14, 137:20-138:4).

The Court further notes that although the Debtor argues that it cannot be sued for construction defects because the builder was California Homes, not Skyline,[36] citing to the ROC's dismissal of the complaint against Skyline in support of this argument, a review of the report of the investigator from the ROC indicates that the complaint, which only alleged unlicensed contracting, was dismissed without prejudice on the basis of insufficient evidence. The investigator found, however, that Skyline Ridge and Mr. Zarifi, as the developer, would be exempt from the licensing requirement under Arizona law, and the investigator further found that Mr. Zarifi and Skyline had "sold the Warranty to the complainants for a two year period and the warranty was valid at the time of this report." (TE 195 at pp. 49-51).

Although Stachowski/Stromberg's ROC complaint was dismissed, it was dismissed without prejudice. Further, in Arizona, privity is not always required in order for a plaintiff to

---

[36] The Court notes that the address for California Homes is 3946 North Tyndall Avenue, Tucson, AZ. (TE 196). This property is listed as an asset of Skyline's bankruptcy estate. (DE 72 at 10).

maintain an action for breach of the implied warranty of workmanship and habitability, *e.g.,* *Richards v. Powercraft Homes, Inc.*, 139 Ariz. 242, 245, 678 P.2d 427, 430 (Ariz. 1984), and under certain circumstances, the seller of a home has a duty to disclose defects such that the seller's failure to do so "has the same legal effect as fraud and misrepresentation." *Hill v. Jones*, 151 Ariz. 81, 85, 725 P.2d 1115, 1119 (Ariz. Ct. App. 1986).

All of the foregoing lend credence to the claims asserted by Stachowski/Stromberg and weigh against the Debtor's success in this litigation.

### ii. Collectability

Given that the Debtor is not asserting any claims against Stachowski/Stromberg, there would be nothing for the Debtor to collect even if it were to be successful in defending against the Stachowski/Stromberg claims. The only party that may encounter collectability issues is Stachowski/Stromberg in the event the Debtor has insufficient funds on hand to pay any claim that is ultimately allowed.

### iii. Complexity, Expense, Inconvenience, and Delay Attendant to Continued Litigation

Litigation of these claims would be complex, and litigation is necessarily costly, inconvenient, and time-consuming. The Debtor could face a net loss given the expense of litigation even in the event the Debtor were to succeed in defending against these claims. No evidence was provided as to the estimated cost of litigation.

### iv. The Interest of Creditors

This settlement would have no negative impact on secured or unsecured creditors holding allowed claims, who would all receive prompt payment in full or in stipulated amounts under Cinco's Plan. Further, it is in the best interest of those holding unliquidated, contingent, and/or disputed claims and insider claims that these claims be settled in order to give such claim holders reasonable assurance that there will be sufficient funds to pay their claims to the extent allowed. The only party that could potentially be negatively impacted by this settlement is Mr. Zarifi. However, given the fact that the settlement limits the Debtor's exposure to $200,000 and avoids all litigation costs, which could be substantial, Mr. Zarifi could actually benefit from this

settlement.

Ultimately, all of the *In re A & C Properties* factors are neutral or weigh in favor of settlement of the Stachowski/Stromberg claims, and the Court finds that the settlement terms are fair and equitable under the circumstances. However, the mechanism for disbursement of funds to Stachowski/Stromberg, as set forth in the proposed settlement, does not take into account the fact that Mr. Linscott is now the proposed Disbursing Agent. As proposed, it is unclear whether the Disbursing Agent would supplant the Debtor and Cinco in the claim distribution process. It is the determination of the Court that Cinco's Plan would therefore need to be amended to clarify the Disbursing Agent's authority over the distribution process.

### e. Settlement of Cinco Claim

As set forth above, the Debtor, Cinco, Mr. Zarifi and Mr. Sheafe, and/or their affiliates, have been involved in litigation for some time, with unresolved disputes regarding the amount owed by Cinco on the Skyline Note, including whether interest is owing and in what amount, Mr. Sheafe's claims for pro-rata payment of the Sheafe Note with the Skyline Note, Cinco's contingent claims for attorneys' fees, and Cinco's claims for damages caused by alleged dumping of construction debris on the Rancho Soldados Property.

Cinco's Plan proposes to settle these disputes. Specifically, Cinco proposes to remit the unpaid principal balance of the Skyline Note, applying all payments to principal, which balance totaled approximately $2,793,959 as of March 2, 2020, to the Debtor in full satisfaction of the Skyline Note; the Debtor and Mr. Zarifi would be required to remove what they have dumped on the Cinco Soldados Property; and Cinco's contingent claims for attorneys' fees and for asserted damages caused by the dumping of construction debris on the Cinco Soldados Property would be released/waived.[37] (*See* DE 588 at § IV.A.). Mr. Zarifi would retain his equity interest in the Debtor, and Mr. Sheafe and Mr. Zarifi would retain their respective equity interests in and personal claims against Cinco. (*See* DE 588 at §§ II.B.13 & IV.A.).

The Debtor opposes the settlement proposed by Cinco, and asserts that Skyline is entitled

---

[37] Although counsel for Cinco represented in his post-trial brief and during closing arguments that Mr. Sheafe was waiving his right to pro rata payment on the Sheafe Note, Cinco's Plan does not include this provision.

to interest, including default interest, on the Skyline Note, with the total amount due in the sum of $8,431,137.17 as of the time of trial. The Debtor asserts that: (1) the respective loan documents provide for interest and cannot be modified except through a signed writing; (2) any extrinsic evidence is inadmissible to contradict the plain terms of the documents; and (3) the settlement is therefore unfair and unreasonable.

### i. <u>Probability of Success in Litigation</u>

#### aa. <u>*Skyline Note-Related Claims*</u>

As set forth in the *Operating Agreement of Cinco Soldados LLC* (the "Operating Agreement") dated July 17, 2006 (TE 87), Cinco Soldados was formed to enable its members to invest, through the entity, in the Cinco Soldados Property. (TE 87 at § 3.1.2).

The Operating Agreement provided the following cash payments to fund the initial capital contributions:

| | | | |
|---|---|---|---|
| A. | Sheafe Trust – the sum of | $166,600.00 |
| B. | Pina – the sum of | $166,700.00 |
| C. | Zarifi – the sum of | $250,000.00 |
| D. | El-Ghotme – the sum of | $250,000.00 |
| E. | Carlier – the sum of | $166,700.00 |

(TE 87 at § 3.1.3).

As noted above, the purchase of the Cinco Soldados Property was also funded, in part, with the $6,000,000 Bank Loan. The members agreed to provide personal guaranties of the Bank Loan in the following amounts:

| | | | |
|---|---|---|---|
| A. | Sheafe Trust – the sum of | $1,199,520.00 |
| B. | Pina – the sum of | $1,200,240.00 |
| C. | Zarifi – the sum of | $3,600,000.00 |
| D. | El-Ghotme – the sum of | $0.00; and |
| E. | Carlier – the sum of | $1,200,240.00 |

(TE 87 at § 3.2.1).

Further, each member was responsible for providing funds for payments due under the

Bank Loan for his respective portion in the following percentages:

|     |              |        |
| --- | ------------ | ------ |
| A.  | Sheafe Trust – | 16.66% |
| B.  | Pina –       | 16.67% |
| C.  | Zarifi –     | 25.00% |
| D.  | El-Ghotme –  | 25.00% |
| E.  | Carlier –    | 16.67% |

(TE 87 at § 3.2.1).

The Operating Agreement also provides that Cinco would obtain a $4,000,000 loan from Mr. Zarifi or his affiliate, which would be subordinate to the Bank Loan (the "Skyline Loan"). (TE 87 at § 3.2.2).

The Operating Agreement refers to the Skyline Loan as the "Subordinate Loan" and provides that the loan would be subordinate to the Bank Loan and "on the same terms as the approved Bank Loan." (TE 87 § 3.2.2). The Operating Agreement further provides that the members would execute personal guaranties of the Skyline Loan, which guaranties were to "terminate automatically" upon an event to be set forth in the loan agreement relating to the Skyline Loan, in the following amounts:

|       |                        |                |
| ----- | ---------------------- | -------------- |
| (i)   | Sheafe Trust – the sum of | $799,680.00 |
| (ii)  | Pina – the sum of      | $800,160.00    |
| (iii) | Zarifi – the sum of    | $2,400,000.00  |
| (iv)  | El-Ghotme – the sum of | $0.00; and     |
| (v)   | Carlier – the sum of   | $800,160.00    |

(TE 87 §3.2.2).

The Operating Agreement further provides that prior to each loan payment on the Skyline Note, each member would provide payment of his respective portion in the same percentage applicable to the Bank Loan as set forth in Section 3.2.1 of the Operating Agreement. (TE 87 § 3.2.2).

Mr. Carlier and Mr. Sheafe testified that because the Rancho Soldados Property was not platted at the time of Cinco's acquisition of the property, and had to be platted within one year

in order to maintain the zoning entitlements on the property, Mr. Zarifi insisted, and the other members agreed, that $4 million of Mr. Zarifi's equity contribution would be in the form of this subordinate loan secured by a second deed of trust on the Rancho Soldados Property.[38] (DE 452 at ¶ 14; 2/6/2020 Trial Tr. 19:10-18). Mr. Carlier and Mr. Sheafe understood that Mr. Zarifi would convert the Skyline Note into equity, equal to all other members, when the Rancho Soldados Property was platted.[39] (DE 452 at ¶ 16; *see* 2/6/2020 Trial Tr. 19:10-18).

The primary documents pertaining to the Skyline Loan include the *Loan Agreement* (the "Loan Agreement") (TE 7), the *Secured Promissory Note* (the "Skyline Note") (TE 8), the *Second Deed of Trust and Fixture Filing* (the "Skyline Deed of Trust") (TE 9), and the *Amendment to Secured Promissory Note and Deed of Trust* (the "Amendment to Skyline Note") (TE 10), collectively, the "Skyline Loan Documents".

The Loan Agreement, dated July 21, 2006, provides for the $4 million loan from Skyline to Cinco to fund a portion of the purchase price of the Cinco Soldados Property. (*See* TE 7 at § 2.1). It further provides that the Skyline Loan is to be guaranteed by the Sheafe Trust, Mr. Pina, Mr. Zarifi, and Mr. and Mrs. Carlier. (TE 7 at § 1.1).

The Loan Agreement provides for interest at the rate set forth in the Skyline Note. (TE 7 at § 2.3). The Skyline Note, dated July 21, 2006, in the original principal amount of $4,000,000, provides for interest at the Prime Based Rate.[40] (TE 8 at § 1). The Prime Based Rate is defined as "[o]ne percent (1.00%) per annum above the Prime Rate[,]" which is defined as "[t]he rate of interest most recently publicly announced in the Western Edition of *The Wall Street Journal* as the 'prime rate.'" (TE 8 § 1). The Prime Rate is subject to change, and under the Skyline Note,

---

[38] Although these are antecedent understandings, the Court is not admitting these understandings for purposes of impermissibly varying or contradicting the terms of a final written agreement; rather, the Court is admitting these understandings for purposes of background and for purposes of analyzing Cinco's reformation argument, see *infra* pp. 51-52. Thus, the parol evidence rule does not bar admission of this testimony. *See Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 152, 854 P.2d 1134, 1138 (Ariz. 1993); *Long v. City of Glendale*, 208 Ariz. 319, 331, 93 P.3d 519, 531 (Ariz. Ct. App. 2004) ("the parol evidence rule does not apply to reformation claims").

[39] See *supra* n. 38.

[40] The Skyline Note gives Skyline the option of electing to have interest accrue at the LIBOR Based Rate instead of the Prime Based Rate. (TE 8 at § 1). However, no party has contended that Skyline made such election.

"[a]ny change in the 'prime rate' shall become effective as of the same date of any such change." (TE 8 at § 1). The Skyline Note also provides for default interest at "[t]he Prime Based Rate plus six percent (6%) per annum" and late charges. (TE 8 at §§ 1, 6).

The following are deemed events of default under the Skyline Note:

> (a) default in the payment of principal or interest when due pursuant to the terms hereof and the expiration of five (5) days after written notice of such default from Lender to Borrower; or
> (b) the occurrence of an event of default under any of the other Loan Documents;
> (c) the occurrence of an event of default under any loan documents relating to Borrower's $6,000,000 loan from [the Bank.]

(TE 8 at § 9).[41]

The original maturity date of the Skyline Note was July 21, 2008. (TE 8 at § 1).

The Loan Agreement and Skyline Note provide that "[n]o provision of th[e] Note [or Loan Agreement] may be changed, discharged, terminated, or waived except in a writing signed by the party against whom enforcement of the change, discharge, termination, or waiver is sought." (TE 7 at § 7.13; TE 8 at § 12).

The Loan Agreement governs and prevails in the event of any inconsistencies between the terms of the Loan Agreement and the terms of the Skyline Note. (TE 7 at § 7.4). None of the Skyline Loan Documents refer to an agreement to convert the Skyline Note to equity.

According to the testimony of Mr. Carlier, a $500,000 payment was due on the Bank Loan in January 2007, and some of the Cinco members were going to have trouble making this required payment to the Bank. (DE 452 at ¶ 20). As a result, Mr. Sheafe negotiated and reached an agreement with the Bank that if a payment of $1,666,667 was made on the Bank Loan, which amount he proposed to loan to Cinco, the next curtailment payment on the Bank Loan would be deferred for approximately one year and no funds would need to be advanced by other Cinco members until that time. (DE 452 at ¶ 21; TE 93; TE 95). Mr. Carlier's testimony on this issue was supported by Mr. Sheafe and not controverted. (*See* 1/16/2020 Trial Tr. 22:14-23:8, 33:21-

---

[41] The Loan Agreement provides that additional events are events of default, none of which are relevant to the dispute at hand. (TE 7 at § 6.1).

23; 2/6/2020 Trial Tr. 27:10-28:11).

In order to memorialize this transaction, Mr. Sheafe notified the members, by memorandum dated November 30, 2006, that an amendment to the Operating Agreement was necessary, which memorandum attached a form of amendment. (TE 97). Cinco asserts that its members executed a *First Amendment to Operating Agreement of Cinco Soldados LLC* (the "First Amendment") (TE 98) effective as of December 1, 2006. (2/6/2020 Trial Tr. 33:5-8; *see also* 2/6/2020 Trial Tr. 33:9-34:23). Mr. Zarifi, however, disputes the validity and effectiveness of the First Amendment. (*See* DE 420 at ¶ 27). Mr. Zarifi does not dispute that it is his signature on the document. (12/18/2019 Trial Tr. 152:19-153:11). Rather, he asserts that he signed a document, but not the First Amendment, and points to the footers on the pages of the First Amendment, which are not identical, in support of his position. (12/18/2019 Trial Tr. 153:12-20; 1/16/2020 Trial Tr. 91:6-92:4). Mr. Zarifi could not, however, identify, describe with any specificity, or produce a copy of the document he asserts he did sign. (*See* 12/18/2019 Trial Tr. 153:21-25; 1/16/2020 Trial Tr. 118:2-119:7).

The signature page, which bears Mr. Zarifi's signature, has a footer dated November 29, 2006. (TE 98; 12/18/2019 Trial Tr. 26:11-13, 28:1-6, 44:4-13). Mr. Carlier's, Mr. Sheafe's, and Mr. Pina's signatures appear on the same page. (TE 98). As with the Operating Agreement, Mr. El-Ghotme signed a counterpart because he was not physically present in Arizona. (12/17/2019 Trial Tr. 211:12-14, 211:21-212:14; *see* TE 98). The main body of the document and the separate signature page, which Mr. El-Ghotme signed[42] and faxed from Lebanon to Mr. Sheafe in Tucson, contain footers dated December 5, 2006. (TE 98; 2/6/2020 Trial Tr. 33:23-34:23).

Mr. McEvoy testified that, as counsel for Cinco, he participated in the preparation of the First Amendment. (DE 423 at ¶ 13). Mr. McEvoy testified that the only differences between the draft of the amendment (TE 97) and the executed version (TE 98) are as follows:

---

[42] Although Mr. Zarifi argued that Mr. El-Ghotme's signature was inauthentic and/or invalid, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter[,]" Fed. R. Evid. 602, and the Court is not persuaded that Mr. Zarifi has personal knowledge with respect to these topics. Further, Mr. Sheafe testified that he was personally involved in the dissemination and receipt of the faxed signature page signed by Mr. El-Ghotme. (2/6/2020 Trial Tr. 33:23-34:23).

- the percentage payment due to the Sheafe Trust of unapplied or unused interest reserve increased from 16.66% in the November 29, 2006 draft to 27.78% in the pages date stamped December 5, 2006;

- the reference to the "Subordinate Loan" is clarified in the pages date stamped December 5, 2006 to refer to this as the Skyline Ridge LLC Loan; and

- Sharon K. Sheafe was removed from the signature pages.

(DE 423 at ¶¶ 15-17).

Mr. McEvoy further testified that the signed copy of the First Amendment, attached to his Declaration, and referenced as Trial Exhibit 98, is the copy he maintains in his file. (1/16/2020 Trial Tr. 130:22-131:20).

Given that Mr. Zarifi did not dispute that it was his signature on page three of the First Amendment, and given that the changes between the draft and the signed document are not material, and do not adversely impact Mr. Zarifi's interest, the Court does not find Mr. Zarifi's argument that he signed a different document to be credible or significant.

Mr. Zarifi argues in the alternative that the First Amendment could not be effective because it is not signed by the Bank or Skyline, and under the loan documents, the Bank and Skyline were required to give written approval of any amendments to the Operating Agreement. (1/16/2020 Trial Tr. 92:4-94:19). As an initial matter, the Loan Agreement provides at Section 5.11 that Cinco shall not allow any amendments to its Operating Agreement without Skyline's prior written consent, which consent shall not be unreasonably withheld or delayed. (TE 7). It does not require that Skyline sign an amendment, as inferred by Mr. Zarifi. There was no evidence presented as to whether such consent was requested. In any event, it is unlikely that such consent could have reasonably been withheld, given that the payment to be made by Mr. Sheafe through Cinco would benefit Skyline by avoiding a payment default under the Alliance Loan. This payment also preserved Mr. Zarifi's equity interest in both Cinco and Skyline.

Further, Mr. Zarifi knew about Mr. Sheafe's proposal to make a loan to Cinco, which loan is addressed in the First Amendment, such knowledge is imputed to Skyline, and there is no indication that Skyline objected to the loan at any point in time.

Given that the Bank Loan documents were never introduced into evidence, there is no way for this Court to evaluate the second prong of Mr. Zarifi's alternative argument, nor is it necessary given that the Bank Loan has been paid off.

In sum, although the Debtor and Mr. Zarifi objected to the admissibility of the First Amendment on foundation and authenticity grounds, an original of a document is not required, and other evidence of the content of the writing is admissible, if the original is lost other than in bad faith or the original cannot be obtained through judicial process, and in this case, the Court finds that Cinco laid a proper foundation and authenticated the First Amendment. *See* Fed. R. Evid. 1004. The Court, therefore, overrules the objection to the First Amendment and admits Trial Exhibit 98.

The First Amendment: (1) provides for Cinco's procurement of a second subordinate loan from the Sheafe Trust in the amount of $1,666,667.00 (the "Sheafe Loan"); (2) provides for the repayment of the Sheafe Loan in the same proportion and at the same time as the Skyline Note, and specifically provides that "[f]or purposes of illustration, if 25% of the Subordinate Loan shall be repaid by the Company, then upon such repayment the Company also shall repay 25% of the Sheafe Loan to the Sheafe Trust[;]" (3) provides that [t]o the extent that [Cinco] shall be liable to pay any imputed interest to the Sheafe Trust in connection with the Sheafe Loan, such imputed interest shall be allocated and charged exclusively to Sheafe so no other member shall have any liability . . . to contribute money to [Cinco] to pay such imputed interest[;]" (4) provides that "[t]o the extent that [Cinco] shall be liable to pay any imputed interest and/or loan fees to the holder of the Subordinate Loan (Skyline Ridge LLC Loan) in connection with the Subordinate Loan, such imputed interest and loan fees shall be allocated and charged exclusively to [Mr.] Zarifi so that no other Member shall have any liability (however allocated to such other Members) to contribute any money to [Cinco] to pay such imputed interest or loan fees[;]" and (5) provides that "[t]o the extent of any inconsistency between the terms and provisions of this First Amendment, and the terms and provisions of the Operating Agreement, the terms and provisions of this First Amendment shall govern and control." (TE 98).

The Sheafe Loan is evidenced by a *Promissory Note*, dated December 6, 2006, in the

principal amount of $1,666,667.00 (the "Sheafe Note"). (TE 101). The Sheafe Note was executed by Mr. Sheafe, as manager of Cinco as the borrower, payable to the Sheafe Trust as the lender. (TE 101). The Sheafe Note provides for interest at 12%, calculated monthly, but not compounded. (TE 101 at § 3). The maturity date in the Sheafe Note is December 1, 2015. (TE 101 at § 1).

Mr. Sheafe testified that although the Sheafe Note provided for interest, it was his understanding that like the Skyline Note, no interest would accrue, and the Sheafe Note would be converted to equity upon the recording of the plat on the Rancho Soldados Property. (2/6/2020 Trial Tr. 38:25-39:13). The Sheafe Note says nothing about converting the note into equity upon the recording of the plat, although Mr. Sheafe maintains that was the agreement between the parties. (*See* TE 101; 2/6/2020 Trial Tr. 39:11-19). Mr. Sheafe did not calculate or make demand for payment of interest on the Sheafe Note. (2/6/2020 Trial Tr. 39:5-11). Further, the Sheafe Note matured, is due and payable, and no payments have been made. (*See* TE 101; 2/6/2020 Trial Tr. 39:5-11, 40:13-17).

Mr. Sheafe's testimony is consistent with the memorandum he sent to the other members of Cinco dated October 24, 2006, which references conversion of the Sheafe Note and Skyline Note to equity, and is consistent with Mr. Carlier's testimony.[43] (TE 94; DE 452 at ¶¶ 16-17; 12/18/2019 Trial Tr. 22:1-2).

Pursuant to the First Amendment and Sheafe Note, the Sheafe Trust advanced $1,666,667 to Cinco to pay off its portion of the Bank Loan. (12/18/2019 Trial Tr. 44:17-20; 2/6/2020 Trial Tr. 35:22-36:5). The amount Mr. Sheafe advanced was more than his personal guarantee on the Bank Loan. (2/6/2020 Trial Tr. 29:2-3).

Mr. Sheafe and Mr. Zarifi ultimately absorbed the interests of the other members and recalculated their member interests. (TE 106). Mr. Sheafe and Mr. Zarifi also began privately capitalizing improvements to the Rancho Soldados Property and paying operating expenses using their own personal funds. (2/6/2020 Trial Tr. 43:4-10, 44:8-21). In total, Mr. Sheafe testified that he contributed at least an additional $1,856,459 to Cinco, after he funded the Sheafe

---

[43] With respect to antecedent understandings, see *supra* n. 38.

Loan, to fund the improvements, make payments on the Bank Loan,[44] and pay Cinco's operating expenses. (2/6/2020 Trial Tr. 43:1-44:21, 46:15-48:4, 49:22-50:2, 50:14-18; TE 106; TE 108). Mr. Sheafe further testified that he would not have contributed these funds had he been told that the Skyline Note was accruing interest or had he known that Mr. Zarifi was not going to convert the Skyline Note to equity given that under such scenario, he would not have been able to recoup his investment and would have been better off walking away. (2/6/2020 Trial Tr. 44:19-45:13, 48:5-14, 50:9-13). In total, Mr. Sheafe estimates that he has invested approximately $6.7-6.8 million in Cinco and the Rancho Soldados Property. (2/6/2020 Trial Tr. 51:2-52:9, 88:11-17).

On June 23, 2014, the parties executed the Amendment to Skyline Note, which: (1) extended the maturity date with respect to payment of the principal balance under the Skyline Note to June 30, 2016; and (2) acknowledged that "[a] dispute exist[ed] between the parties as to whether any interest [was] owing, or ever has been owed, on the debt relating to the Loan Documents." (TE 10). As of the date of the Amendment to Skyline Note, Cinco had not made any payments on the principal balance owing under the Skyline Note. (TE 10 at ¶ B).

In approximately 2014, Cinco began selling Rancho Soldados Property lots. (2/6/2020 Trial Tr. 118:4-7). As of May 1, 2019, payments totaling no less than $940,085.05 had been made on the Skyline Note from properties sold within the Rancho Soldados Property.[45] (*See* TE 4; DE 583 at § 2). Since May 1, 2019, additional payments totaling no less than $272,493.13 have been made on the Skyline Note from properties sold within the Rancho Soldados Property.[46] (DE 573; DE 581). There have never been any payments made on the Sheafe Note.

---

[44] Ultimately, after having absorbed Mr. Pina's, Mr. Carlier's, and Mr. El-Ghotme's portions of the Bank Loan, Mr. Sheafe paid approximately 2/3 of the Bank Loan and Mr. Zarifi paid about 1/3 of the Bank Loan. (2/6/2020 Trial Tr. 95:18-24).

[45] According to the calculation of the Skyline Loan balance the Debtor introduced into evidence during the course of the confirmation hearing, as of May 1, 2019, Cinco had made payments totaling $940,085.05 on the Skyline Note. (*See* TE 4). However, according to the Debtor's closing brief, as of May 1, 2019, Cinco had made payments totaling $965,949.65 on the Skyline Note. (DE 583 at § II).

It is Cinco's position that as of March 2, 2020, it had made payments totaling $1,206,041.00 on the Skyline Note. (*See* DE 588 at § IV.A.).

[46] For a period of time, the parties operated in accordance with an *Irrevocable Escrow Instructions Agreement* (TE 112) and for another period of time, the parties operated in accordance with a *Settlement Agreement* (TE 11), but there is currently no agreement in place with respect to what happens to the proceeds from a sale of property within the Rancho Soldados Property. (2/6/2020 Trial Tr. 63:1-2).

1  (DE 427 at ¶ 16; 2/6/2020 Trial Tr. 40:13-14).

2       It is Cinco's position that the parties agreed that: (1) contrary to the express terms of the

3  Skyline Note, the Skyline Note would not bear interest; (2) contrary to the express terms of the

4  Skyline Note, the Skyline Note would be converted into equity when the plat was recorded in

5  2007; and (3) the Skyline Note would be paid pro rata with the Sheafe Note.

6       It is the Debtor's position that the express terms of the Skyline Loan Documents, as well

7  as the statute of frauds, parol evidence rule, and related doctrines, bar Cinco's arguments. It is

8  also the Debtor's position that the Skyline Note began to accrue interest from the date of the

9  Skyline Note, began to accrue default interest on July 21, 2008, which was the original maturity

10  date, and that the balance of the Skyline Note as of May 30, 2019 was $8,431,137.17,

11  representing $4,000,000 in unpaid principal, $1,787,803.84 in unpaid non-default interest, and

12  $2,643,333.33 in unpaid default rate interest. (TE 4; 12/17/2019 Trial Tr. 27:12-14, 63:24-64:2,

13  64:24-2, 65:7-9). To reach these figures, the Debtor applied the $940,085.05 it asserts had been

14  paid on the Skyline Note as of May 1, 2019 to accrued interest. (TE 4; *see* DE 416 at ¶ 18).

15       Cinco counters that: (1) the First Amendment is ambiguous and should be interpreted as

16  a manifestation of the parties' agreement that interest would not accrue under the Skyline Note

17  or Sheafe Note;  and, alternatively, (2) the parties' conduct is admissible to prove that the parties

18  agreed that no interest would accrue on the Skyline Note and/or that the Skyline Note was to be

19  converted into equity, citing theories of oral modification, course of dealing, part performance,

20  restitution, reformation, and estoppel.

21       Cinco argues that even if the Skyline Loan accrues interest, the Debtor's loan calculation

22  is incorrect because: (1) the maturity date was extended to June 30, 2016;  (2) even after the

23  extended maturity date, there was no demand for payment made until about the time the Bank

24  Loan was paid off in approximately August of 2016; and (3) the first time that interest income

25  was reported on one of the Debtor's monthly operating reports was in the April 2019 report.

26       At this juncture, the Court need only weigh the probability of each party's success on the

27  merits in order to determine whether the proposed compromise is fair and equitable.

28       As an initial matter, the proposed settlement before the Court is between Cinco and

Skyline. The Cinco Plan would not affect the rights or liabilities of Mr. Sheafe or his affiliates, or Mr. Zarifi or his affiliates other than Skyline, with respect to Cinco. (DE 588 at § IV.A.). There is also nothing in Cinco's Plan that purports to affect the rights or liabilities as between Mr. Sheafe or his affiliates, and Mr. Zarifi or his affiliates, other than Skyline.[47]

The Court will address Cinco's litigation theories in turn.

Cinco contends that the imputed interest provision in the First Amendment overrides the interest provision in the Skyline Note. Cinco contends that such provision would only have been included if the parties had reached an agreement that interest would not accrue on either the Skyline Note or the Sheafe Note.

Although "a contract should be interpreted, if at all possible, in a way that does not render parts of it superfluous," *Taylor v. State Farm*, 175 Ariz. at 158, 854 P.2d at 1145, the Court is not persuaded that the First Amendment can or should be read as nullifying the interest provision in the Skyline Note. As an initial matter, the First Amendment amends the Operating Agreement, not the Skyline Note. Further, the imputed interest provision could be read as a fall back provision applicable in the event either Mr. Zarifi or Mr. Sheafe waived the right to charge interest on his respective loan.

As an alternative argument to overcome the interest provision in the Skyline Note, Cinco contends that the parties orally modified the interest provision in the Skyline Note.

Under Arizona law, a modification to a material term in an agreement that falls within the statute of frauds[48] must generally be in writing in order to be enforceable. *Best v. Edwards*, 217 Ariz. 497, 500, 176 P.3d 695, 698 (Ariz. Ct. App. 2008). However, Cinco argues that because Skyline never received an interest payment and never demanded that interest be paid, the interest term in the Skyline Note is immaterial, and therefore the oral modification need not have been in writing.

Generally, the Court would not find Cinco's argument particularly persuasive given that

---

[47] Thus, the Court need not address Cinco's restitution theory given that the party with standing to assert a restitution claim would be Mr. Sheafe and/or his affiliates, not Cinco.

[48] There is no genuine dispute that the Skyline Note would generally fall within the scope of Arizona's statute of frauds. *See also* A.R.S. § 44-101(9).

provisions for interest are typically essential terms of loan agreements promissory notes. *See, e.g.*, *In re Commercial Servs. Bldg. Inc.*, No. 8:09-BK-20845-ES, 2019 WL 2403228, at \*7 (B.A.P. 9th Cir. June 5, 2019). However, the evidence presented in this case indicates that the parties acted for years as if no interest was due and owing on the Skyline Note; specifically, no monthly interest payments were made on the Skyline Note, no statements were issued, the books of Skyline did not record interest liability, nor did the tax returns, and no demand was made on the Skyline Note until after payoff of the Bank Loan. Based on this evidence a court could foreseeably find Cinco's argument as to the materiality of the interest rate in the Skyline Note persuasive.

Even if a court were not persuaded by Cinco's immateriality argument, if application of the statute of frauds in a particular instance would result in fraud or lead to an inequitable result, application of the statute of frauds can be circumvented, as has long been recognized by Arizona courts. *Owens v. M.E. Schepp Ltd. P'ship*, 218 Ariz. 222, 225-26, 182 P.3d 664, 667-68 (Ariz. 2008); *Best v. Edwards*, 217 Ariz. at 500, 176 P.3d at 698 (quoting *Cottrell v. Nurnberger*, 131 W.Va. 391, 47 S.E.2d 454, 463-64 (W. Va. 1948)).

The overlapping doctrines of equitable estoppel and part performance, in particular, can be applied to overcome application of the statute of frauds. *See In re Peter Peter Cottontail, LLC*, 498 B.R. 242, 248 (Bankr. D. Ariz. 2013); *Owens v. M.E. Schepp Ltd. P'ship*, 218 Ariz. at 226, 182 P.3d at 668. Cinco argues that both such doctrines apply in this case.

Equitable estoppel "precludes one because of 'his own acts from asserting a right to the detriment of another who, entitled to rely on such conduct, has acted thereon.'" *Best v. Edwards*, 217 Ariz. at 502-03, 176 P.3d at 700-01 (quoting *Waugh v. Lennard*, 69 Ariz. 214, 223, 211 P.2d 806, 812 (Ariz. 1949)). In order "to assert equitable estoppel and avoid the statute of frauds, a promisee must 'show substantial additional detriment,' . . . beyond just the loss of the benefit of the alleged agreement." *Id.* (quoting *Del Rio Land, Inc. v. Haumont*, 118 Ariz. 1, 7, 574 P.2d 469, 475 (Ariz. Ct. App. 1977)).

Under the related part performance exception to the statute of frauds, "the acts of part performance take an alleged contract outside the statute [of frauds] . . . if they cannot be

explained in the absence of the contract." *Owens v. M.E. Schepp Ltd. P'ship*, 218 Ariz. at 226, 182 P.3d at 668. In order for the part performance exception to apply, there must be performance that is "unequivocally referable" to the alleged agreement such that the performance alone, without the aid of the words of the promise, would be unintelligible, or at a minimum, extraordinary. *Id.* (quoting *Burns v. McCormick*, 233 N.Y. 230, 135 N.E. 273 (N.Y. Ct. App. 1922)); *see also In re Peter Peter Cottontail, LLC*, 498 B.R. 242, 248-49 (Bankr. D. Ariz. 2013). Asin the equitable estoppel context, the party asserting the part performance exception must establish sufficient detrimental reliance. *See In re Peter Peter Cottontail, LLC,* 498 B.R. at 248-50.

In this case, a court adjudicating the underlying merits of the parties' claims could find that: (1) had Mr. Sheafe, in his capacity as manager of Cinco, not been operating under the understanding that the Skyline Note would be converted into equity and/or would not bear interest, would not have renegotiated the Bank Loan on six different occasions, and would have allowed the Bank to foreclose, rather than make additional advances to Cinco to cover payments on the Bank Loan, complete infrastructure, and pay property taxes; (2) as such, Cinco, acting through its manager, relied to its detriment on an oral agreement that the Skyline Note would be converted into equity and/or would not bear interest; (3) Cinco's subsequent actions, including Cinco's execution of the Sheafe Note, represent sufficiently substantial additional detriment beyond the loss of the benefit of the alleged agreement; and (4) Mr. Sheafe, as manager of Cinco, sufficiently performed in accordance with an agreement that the Skyline Note would be converted into equity and/or would not bear interest in a manner unequivocally referable to the existence of such agreement. Based upon the foregoing, a court could find the doctrine of part performance and/or equitable estoppel applicable to overcome application of the statute of frauds.[49]

A court could also find an enforceable oral modification under the circumstances given

---

[49] Because Cinco has established colorable claims to overcome application of the statute of frauds, Cinco has established colorable claims to overcome the term in the Skyline Note requiring that changes to the Skyline Note be in writing. *Eng v. Stein*, 123 Ariz. 343, 346, 599 P.2d 796, 799 (Ariz. 1979); *Harbor Mech., Inc. v. Arizona Elec. Power Co-op., Inc.*, 496 F. Supp. 681, 686 (D. Ariz. 1980); *Schrock v. Fed. Nat. Mortg. Ass'n*, No. CV 11-0567-PHX-JAT, 2011 WL 3348227, at *7 (D. Ariz. Aug. 3, 2011).

that: (1) the parties acted for years as if no interest was due and owing on the Skyline Note; (2) no statements were issued; (4) Cinco did not record interest liability on its records or its tax returns; (5) Mr. Zarifi did not mention the lack of interest on Cinco's books to Cinco's accountant when he met and reviewed records; (6) no demands for payment were made until around the time that the Alliance Note was paid in approximately August of 2016; and (7) no default notices were ever issued. (12/17/2019 Trial Tr. 71:3-72:6; 12/18/2019 Trial Tr. 51:16-24; 52:2-53:8, 175, 183; DE 427 at ¶¶ 8, 12, 15; 2/6/2020 Trial Tr. 20-21, 116; 2/6/2020 Trial Tr. 20:17-25; DE 427 at ¶¶ 12, 15).

The only calculation of the amount due on the Skyline Note submitted into evidence before this Court was prepared by the Debtor's bankruptcy counsel. (12/17/2019 Trial Tr. 153:4-7, 154:16-155:1; TE 4). Although such calculation was reviewed by Mr. Linscott, Mr. Linscott did not prepare the calculations, and Mr. Linscott's review of the loan balance was based on a number of assumptions, including that the Skyline Note began to accrue default interest when Cinco failed to pay the outstanding balance due on the original maturity date of July 21, 2008, and that all payments received on the Skyline Note were to be applied against accrued interest. (DE 416 at ¶ 18; 12/17/2019 Trial Tr. 26:17-27:1, 32:6-8, 61:10-11, 90:5-9).

The Debtor's calculation of interest on the Skyline Note includes in excess of $2.6 million in default rate interest, commencing on the original maturity date of July 21, 2008, even though the maturity date was extended to June 30, 2016. (TE 4). Further, there was no evidence presented that a written demand was made, as required under the Skyline Note, to trigger an event of default. (*See* 12/17/2019 Trial Tr. 65:18-20; 2/6/2020 Trial Tr. 20:21-25, 21:14-21, 25:3-6; DE 423 at ¶ 25; TE 8). Thus, even if interest accrues on the Skyline Note, it would accrue at the non-default rate only, which would reduce the debt obligation as calculated by Skyline by approximately $2,643,333.33.

Further, the First Amendment contains provisions for potential "imputed interest," which is the interest imputed by the IRS if either the Skyline Note or the Sheafe Note had no interest or an interest rate lower than the applicable federal rate of interest ("AFR"). (TE 98; DE 423 at ¶ 21). Given that the face interest rate on both notes is above the AFR, this provision could

support a finding that there existed an agreement that the notes were actually interest free. (*See* DE 423 at ¶¶ 22-24; 1/23/2020 Trial Tr. 27:13-28:1, 36:1-6, 38:17-22, 45:18-46:6; 2/6/2020 Trial Tr. 37:2-38:7, 38:12-24).

Cinco has also asserted course of dealings and reformation theories[50] in support of its position. Although Cinco did not develop its course of dealings theory through its briefing or argument, under the theory of reformation, "[a] court can reform a contract where it does not express the terms of the agreement reached by the parties as a result of a mutual mistake." *Radix Law PLC v. Mullen*, No. CV-19-05248-PHX-JAT, 2020 WL 1139148, at *1 (D. Ariz. Mar. 9, 2020). A party seeking reformation of a written agreement must establish that the parties to the agreement mutually agreed to the terms the party is seeking in its claim for reformation, but that there was a mistake during the execution of the written agreement with respect to those terms. *Id.* (citing in part *SWC Baseline & Crismon Inv'rs, L.L.C. v. Augusta Ranch Ltd. P'ship*, 228 Ariz. 271, 279, 265 P.3d 1070, 1078 (Ariz. Ct. App. 2011)).

Because "mistakes are the exception, not the rule" and because the law of contracts "attaches great weight to the written expression of an agreement[,]" "the remedy of reformation should be granted sparingly." *Id.* at *2. That being said, "[b]ecause reformation is a form of equitable relief, the court has discretion in deciding whether to invoke it." *Id.*

The Cinco organizational documents and the Skyline Loan Documents show that they are not consistent with the understandings of the parties or the parties' subsequent course of conduct.

Mr. Zarifi, Mr. Sheafe, and Mr. Carlier testified that the members of Cinco agreed among themselves how Bank Loan payments would be allocated, but the parties' agreements regarding payment allocations do not match those set forth in the Operating Agreement. (12/18/2019 Trial Tr. 34:7-16, 38:24-39:17; 1/16/2020 Trial Tr. 15:11-16:4; 2/6/2020 Trial Tr. 16:6-17:1, 133:2-11). For example, pursuant to the Operating Agreement, Mr. Zarifi was responsible for 25% of the Bank Loan payments. (TE 87 at § 3.2.1). Mr. Zarifi, however, testified that he was never

---

[50] The Court will note that "the parol evidence rule does not apply to reformation claims." *Long v. City of Glendale*, 208 Ariz. at 331, 93 P.3d at 531.

responsible for any Bank Loan payments and made no Bank Loan payments until he took over other members' bank obligations in order to increase his equity interest in Cinco. (12/18/2019 Trial Tr. 137:4-138:3, 138:14-139:5). Mr. Carlier testified that the understanding of the members was that the Bank Loan was to be paid 5/6 by Sheafe/Pina/Carlier and 1/6 by Zarifi/El-Ghotme. (12/18/2019 Trial Tr. 34:7-16, 39:14-17). Mr. Zarifi did not controvert this percentage split, but contends that El-Ghotme was responsible for the 1/6 payment. (1/16/2020 Trial Tr. 15:11-16:4, 20:16-19).

The Operating Agreement further provides that Mr. Zarifi guaranteed 50% of the Bank Loan in the amount of $3.6 million. (TE 6 at § 3.2.1). Mr. Zarifi testified that he guaranteed his brother-in-law's 25%, which would be $1.8 million. (1/16/20 Trial Tr. 17). However, there was no explanation as to why Mr. Zarifi would guarantee 50% of the Bank Loan, yet not be responsible for any payments on the Bank Loan.

Further, with respect to the Skyline Loan, the Operating Agreement provides that Mr. Zarifi would be responsible for payments in the same percentage as on the Bank Loan, which would be 25%, and that he would guarantee the Skyline Loan in the sum of $2.4 million. (TE 87 at § 3.2.2). These provisions have been ignored, or overlooked, by Skyline, but, as counsel for Skyline pointed out in closing arguments, there is no dispute that Mr. Zarifi would not have agreed to make payments on the Skyline Note. (4/9/2020 Trial Tr. 33:2-12).

Additionally, although the Skyline Note and the Sheafe Note contain interest provisions, it is the testimony of Mr. Sheafe and Mr. Carlier that such obligations would not accrue interest, as they were to be converted to equity upon the platting of the Cinco Soldados Property. (DE 425 at ¶¶ 16-17; 2/6/2020 Trial Tr. 19:10-18, 38:25-39:13; *see also* TE 93).

It is clear that the Cinco documents and the Skyline Loan did not accurately reflect the understandings of the parties. What is not clear is whether there was a mutual agreement as to any of foregoing terms. Although a court could find grounds to reform the Skyline Note, it is not so clear what the terms of reformation would be.

### *bb.* *Dumping Claims*

With respect to Cinco's claim for damages arising from the Debtor's and/or Mr. Zarifi's

alleged dumping of debris on the Rancho Soldados Property, Mr. Sheafe testified that without permission and without warning, approximately two years ago, Mr. Zarifi and/or Skyline started stacking construction debris on the Rancho Soldados Property, and such debris now covers approximately 1.5 to 2 acres of the Rancho Soldados Property. (2/6/2020 Trial Tr. 79:15-21, 80:24-25, 124:3-126:8). Mr. Sheafe alleges that the debris has and continues to damage Cinco because it has upset Rancho Soldados Property residents, scared away potential buyers of Rancho Soldados Property homes, and prevented Cinco from building the next phase of its development. (2/6/2020 Trial Tr. 80:11-25, 81:5-7). Neither Mr. Zarifi nor Skyline has denied Cinco's dumping allegations.

In sum, based upon the foregoing, the Debtor's likelihood of success on the merits is uncertain.

### ii. Collectability

For purposes of collection on a secured debt, the underlying collateral and ability to realize that collateral are important factors in assessing the collectability of that debt. (*See* 12/17/2019 Trial Tr. 87:11-16). Based on Mr. Bradley's appraisal, the as is bulk sale value[51] of the Rancho Soldados Property was $5 million as of May 2, 2019. (DE 404 at ¶ 4, Ex. B; TE 16). Although Mr. Zarifi and Mr. S. Zarifi offered opinions as to the value of the Cinco Property, neither is the owner of the property or qualified to offer an expert opinion as to the value of the property. Further, although Mr. Sheafe opined that the Cinco Soldados Property was worth $6 million as of the time of trial, it is the determination of the Court that the best evidence of value is that submitted by Mr. Bradley. Two finished lots have since been sold, reducing the value of Cinco's interest in the Cinco Soldados Property to under $5 million. (*See* DE 573; DE 581).

Based upon its appraised value, the Debtor's maximum collectible claim on the Skyline Note is approximately $5 million, which is approximately $3.4 million less than the Debtor's

---

[51] The as is bulk sale value is Mr. Bradley's opinion as to "the most probable price for which the entirety of the [Cinco Soldados Property] could be sold to a single purchaser acquiring the [Cinco Soldados Property] in exactly the condition it was in on May 2, 2019, without any further improvements, repairs, or refinement." (DE 404 at ¶ 5).

asserted claim under the Skyline Note, and the collection of which would require continued litigation of the underlying claims and foreclosure litigation. Further, given the provision in the First Amendment that requires proportional payment of the Sheafe Note, the amount Skyline could collect on its note would be further reduced.

The collectability of a debt also hinges on the age of such debt. (12/17/2019 Trial Tr. 72:7-15). Further, in this case there could be statute of limitations issues.[52] (12/17/2019 Trial Tr. 72:22-73:9; *see also* A.R.S. § 12-548).

Ultimately, the Debtor's ability to collect on this debt is uncertain.

### iii. <u>Complexity, Expense, Inconvenience, and Delay Attendant to Continued Litigation</u>

Given the numerous issues of fact and law involved, litigation over the Skyline Note and the potential foreclosure of the Skyline Deed of Trust would be extremely time-consuming and costly. Further, because the Debtor asserts that the balance owing on the Skyline Note is more than the value of the collateral securing the Skyline Note, the Debtor has no ability to recoup its attorneys' fees and costs. However, if these claims were to be litigated, the Debtor would incur the risk of having to pay Cinco's attorneys' fees and costs in the event Cinco were to succeed. Moreover, there is no certainty as to the strength of the market for the continued sale of Rancho Soldados Property lots.

### iv. <u>The Interest of Creditors</u>

Secured and unsecured creditors would benefit from the proposed settlement given that they would all promptly be paid in full from the settlement proceeds. The only party that could be negatively impacted by this settlement is Mr. Zarifi.

Contrary to Mr. Zarifi's assertions that this compromise is a ploy by Mr. Sheafe to forcibly strip Mr. Zarifi of his interest in Cinco by allowing or enabling the lender who funds the Cinco Settlement to promptly foreclose upon the Rancho Soldados Property, there is no evidence that this is the intended outcome or even a probable outcome of the compromise. Mr.

---

[52] Debtor's counsel informed the Court during closing arguments that after the conclusion of evidence, the Debtor had commenced a judicial foreclosure action against Cinco to address statute of limitations issues and preserve the Debtor's § 108 rights. (4/9/2020 Trial Tr. 25:18-26:6).

Zarifi himself has acknowledged that his belief in this outcome is premised on there being a private lender funding the Cinco Settlement. (1/16/2020 Trial Tr. 55:19-56:5, 84:20-85:6). Although Cinco's Disclosure Statement contemplated that the Cinco settlement would be funded by two loans, one a commercial bank loan and the other privately funded, there is nothing in Cinco's Plan that provides for a private lender, and Mr. Sheafe testified that the proposed lender is Foothills Bank, a commercial lender. (*See* DE 588; DE 217 at VII.A.3; 2/6/2020 Trial Tr. 83:2-3, 112:8-14, 180:11-22).

Further, as Mr. Zarifi acknowledged, if there is a foreclosure by any lender on the Rancho Soldados Property, Mr. Sheafe, who holds a majority ownership interest in Cinco, and who has proposed to personally guarantee this new loan, would lose his majority interest in Cinco, remain personally liable on his personal guarantee, and lose the approximate $6.7 to 6.8 million he has invested in Cinco.[53] (1/16/2020 Trial Tr. 85:17-20; *see also* 2/6/2020 Trial Tr. 83:18-21). There would be no economic advantage for Mr. Sheafe, individually or as manager of Cinco, to cause a lender to foreclose upon the Cinco Soldados Property, and Mr. Sheafe acknowledged as much. (2/6/2020 Trial Tr. 87:16-24).

Upon consideration of the foregoing, the majority of the *In re A & C Properties* factors weigh in favor of the settlement. It is clear that the Cinco organizational documents and the Skyline Loan Documents do not accurately portray the understandings of the parties, and continued litigation between Cinco and Skyline would be complex and uncertain, for both sides. The Cinco settlement, however, only proposes to pay Skyline the principal balance on the Skyline Note, which does not sufficiently account for the possibility that Skyline could prevail in part.[54] The proposed settlement is also ambiguous as to whether Mr. Sheafe has agreed to waive his right, if any, to interest under the Sheafe Note or his right to pro rata payment of the Sheafe Note. For these reasons, the Court does not find that the settlement as proposed by Cinco is sufficiently clear or fair and equitable.

---

[53] Mr. Sheafe testified that of the $6.7 to $6.8 million he has invested in Cinco, he has been repaid approximately $130,000, which amount he received for engineering-related work on the Rancho Soldados Property. (2/6/2020 Trial Tr. 88:18-89:6).
[54] The Court finds that any damages arising from the dumping claims would be relatively minimal. (*See also* 2/6/2020 Trial Tr. 126:126:10-18).

It is the Court's determination that a modification of the settlement, which clarifies the foregoing and provides for additional consideration from Cinco to Skyline would be required to find the settlement to be fair and equitable. Such modification would provide Skyline with full recovery of principal on the Skyline Note and of Mr. Zarifi's capital contribution, plus additional consideration, before Mr. Sheafe would be able to recover any payment on the Sheafe Note, or recover any of his additional contributions to Cinco.

## B. Section 1129(a)(2) – Plan Proponent Compliance With Code

Pursuant to § 1129(a)(2), the Court can only confirm a plan if the plan proponent has complied with all applicable provisions of the Code. "Some courts have strictly construed § 1129(a)(2) and denied plan confirmation for any violation of the Bankruptcy Code[,]" while "[o]ther courts have taken a more lenient approach." *In re Dunlap Oil Co., Inc.*, No. BAP AZ-14-1172-JUKID, 2014 WL 6883069, at *11 (B.A.P. 9th Cir. Dec. 5, 2014). A finding that a plan proponent has not acted with bad intent can be a mitigating factor sufficient to overcome violations of the Code for purposes of § 1129(a)(2). *See id.* at *12.

Each side contends that the other side has not complied with all applicable provisions of the Code in violation of § 1129(a)(2).

### 1. __Debtor's Plan__

The objectors to the Debtor's Plan cite to the following as examples of the Debtor's failure to comply with applicable provisions of the Code: (a) shortly after the Petition Date, without a Court order, the Debtor agreed to release the lien of the Skyline Deed of Trust on three Rancho Soldados Property lots purchased by insider Mr. S. Zarifi and/or his affiliate without payment or a written agreement for repayment; (b) this case was dismissed twice in its early days because the Debtor failed to timely file its master mailing list, schedules, and statements; (c) Mr. Baldwin, as counsel for the Debtor, never disclosed that he represented both the Debtor and Mr. Zarifi individually in a pending state court matter; (d) the Debtor sought and obtained Court approval to sell various properties during the pendency of this case, but did not file reports of sale as required until shortly before the contested confirmation hearing began; (e) the Debtor did not file accurate operating reports and often filed its reports untimely, both of which actions

were violative of Rule 2015, and the Debtor corrected certain errors only after they were raised by Cinco; (f) without Court approval, the Debtor paid its outstanding tax claims with funds from an unauthorized loan from Mr. S. Zarifi and/or his affiliate; and (g) without Court approval, the Debtor paid a portion of Mr. Zarifi's home mortgage payment. (DE 584 at 29-31).

While the objections have accurately described the deficiencies in Skyline's conduct during the course of this case, most of the described deficiencies have been corrected. Given this, the deficiencies do not alone warrant a determination that the Debtor's Plan is not confirmable, but are relevant, and will be considered with respect to other requirements for confirmation.

The Court finds that the Debtor's Plan satisfies the requirements of § 1129(a)(2).

## 2.  Cinco's Plan

The Debtor asserts that Cinco's Plan violates the Code because the proposed settlements are not fair and reasonable, and Cinco does not have standing to settle such claims. (DE 583 at 25-27).[55]

The Court has determined that Cinco does have standing to settle claims through a plan,[56] and the Court has found all of the settlements except the settlement of the Cinco claims to be fair and reasonable. Because these arguments have previously been addressed under the § 1129(a)(1) analysis, no further discussion is necessary here. Further, § 1129(a)(2) requires only that a plan proponent comply with the Code, not that the plan comply with the Code. There is no evidence that Cinco has not complied with the Code.

The Court therefore finds that Cinco's Plan satisfies § 1129(a)(2) of the Code.

## C.  Section 1129(a)(3) – Good Faith

Section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Under Ninth Circuit case law, a court need only look

---

[55] A § 1129(a)(2) objection was also raised by the Rallis Creditor Group on the basis that Cinco's Disclosure Statement did not provide it with adequate information about the funding source for Cinco's Plan. However, Mr. Sheafe provided additional information about the proposed funding source for Cinco's Plan during the contested confirmation hearing, and the Rallis Creditor Group's feasibility-related objections will be addressed in the Court's § 1129(a)(11) analysis below.
[56] See *supra* section IV.A.1.

to the circumstances surrounding the proposal of the plan for purposes of § 1129(a)(3). *Garvin v. Cook Investments NW, SPNWY, LLC*, 922 F.3d 1031, 1035 (9th Cir. 2019). Courts need not look further, to the terms of the plan itself. *Id.*

### 1. **Debtor's Plan**

The objectors to the Debtor's Plan argue that the plan has not been proposed in good faith as is required by § 1129(a)(3) because, among other things: (1) the Debtor's Plan disregards Mr. Parri's Charging Order in an attempt to avoid the order; and (2) the Debtor's post-petition actions, including the filing of inaccurate operating reports, the entering into of out-of-the-ordinary-course business transactions and loans without Court approval, the holding of estate funds in non-DIP accounts, and the paying of pre-petition taxes without Court approval, demonstrate a lack of good faith.

As an initial note, Mr. Parri's claim is being treated in the non-insider general unsecured class in the Debtor's Plan. Further, although the Debtor has not been a model debtor-in-possession, the Court does not find that the Debtor <u>proposed</u> the Debtor's Plan in bad faith or by any means forbidden by law.

Thus, the Court finds that the Debtor's Plan satisfies § 1129(a)(3).

### 2. **Cinco's Plan**

The objectors to Cinco's Plan argue that Cinco's Plan is a bad faith attempt by one of the estate's largest debtors to take advantage of Skyline's unrelated financial difficulties in order to obtain a substantial discount on the debt it owes to the estate through an unfair, forced settlement, which result would be inconsistent with the objectives and purposes of the Code.

Under Ninth Circuit case law, the Court is not required to evaluate the terms of a plan for purposes of § 1129(a)(3), and there is no evidence before the Court that Cinco has proposed its plan in bad faith.

Further, even if the Court were to look to the terms of Cinco's Plan, Cinco's Plan is a full-payment plan under which all but one of the many disputed, contingent, and/or unliquidated claims would be settled, all creditors holding allowed claims would be paid in full shortly after the Distribution Date from settlement funds that would be remitted to the Disbursing Agent to

distribute through the plan, the Debtor would retain all of its assets other than its interest in the Skyline Note, and Mr. Zarifi would remain the manager of the Debtor, retain his 100% ownership interest in the Debtor, and retain his ownership interest in Cinco.

"The Ninth Circuit is firmly committed to the rule that the law favors and encourages compromise settlements" given that "[s]ettlement agreements conserve judicial time and limit expensive litigation. *Ahern v. Cent. Pac. Freight Lines*, 846 F.2d 47, 48 (9th Cir. 1988) (internal quotations omitted).

Further, the Debtor's argument that by paying Skyline less on the Skyline Note, Mr. Sheafe would benefit by being able to distribute more to himself from Cinco is not convincing given that Mr. Zarifi is likewise a member of Cinco and would be entitled to any distributions made to members.

Based upon the foregoing, the Court does not find that Cinco has proposed any of the settlements in its plan in bad faith, for an improper purpose, or by any means forbidden by law. The Court therefore finds that Cinco's Plan satisfies § 1129(a)(3).

### D. Section 1129(a)(5) – Continued Management of Debtor

Section 1129(a)(5) of the Code requires that a plan disclose the identity, compensation to, and affiliations of any individual who will serve as an officer, director, or voting trustee, including whether such individual is an insider, and requires that such appointment be consistent with the interests of creditors, equity security holders, and public policy. 11 U.S.C. § 1129(a)(5).

"A [c]hapter 11 plan may not be confirmed if the continuation in management of the persons proposed to serve as officers or managers of [the] debtor is not in the interests of creditors and public policy." *In re Bashas' Inc.*, 437 B.R. 874, 912 (Bankr. D. Ariz. 2010); *see also* 11 U.S.C. § 1129(a)(5)(A)(ii). "[C]ontinued service by prior management may be inconsistent with the interests of creditors and public policy if it directly or indirectly perpetuates incompetence, lack of discretion, inexperience or affiliations with groups inimical to the best interests of the debtor." *In re Bashas' Inc.*, 437 B.R. at 912.

#### 1. **Debtor Plan**

The objectors to the Debtor's Plan argue that the plan's proposal to have Mr. Zarifi

continue to manage the Debtor is not in the best interests of creditors or public policy, and therefore violates § 1129(a)(5). These objectors argue that Mr. Zarifi should not be permitted to manage the Debtor post-confirmation because Mr. Zarifi: (a) ignores the law by, among other things, not paying judgments and sanctions, committing assault, and engaging in illegal contracting; (b) ignores the Code and Rules as discussed above; (c) breaches promises and does not keep his word; (d) takes actions that further irrational grievances; (e) makes false, unsupported payment demands; and (f) did not testify honestly before this Court.

Under the Debtor's Plan, Mr. Linscott would serve as the Disbursing Agent. (TE 21 at § 1.21; *see also* DE 416 at § C). However, Mr. Zarifi would, among other things: (1) continue to manage the Debtor; (2) decide what funds are paid to the Disbursing Agent for distribution to creditors; (3) decide whether to buy, sell, or refinance property to fund the payment of claims; and (4) decide how to prosecute all pending and future litigation to which the Debtor is a party, including how claims litigation would be prosecuted and how litigation with Cinco would proceed. (*See* TE 21 at §§ 1.21, 4.1, 5.2; 12/17/2019 Trial Tr. 34:13-36:5, 37:21-39:25; 12/18/2019 Trial Tr. 63:3-18).[57]

Although some creditors testified as to their belief that Mr. Zarifi is trustworthy and competent, other creditors testified that based upon their personal experiences, Mr. Zarifi is not trustworthy, is unreasonable, and cannot be trusted to carry out the terms of the Debtor Plan. (*Compare* DE 418; 12/17/2019 Trial Tr. 100:4-12 *with* DE 424 at ¶¶ 32-33; DE 426 at ¶ 38; DE 429 at ¶¶ 14, 15, 32; 2/6/2020 Trial Tr. 63:15-16, 82:4-5).

During the course of this case, under Mr. Zarifi's management, as aided by a number of Court-appointed professionals, the Debtor has paid down approximately $2.3 million of its secured debt and has accumulated net proceeds from sales of real property. (*See* DE 420 at ¶ 45; DE 255; DE 264; DE 280; DE 432 at ¶ 6; DE 573).

However, in his capacity as manager and the responsible party of the Debtor:

---

[57] Although the Debtor highlights that under its plan the Court could add to the Disbursing Agent's rights, powers, and authority, none of the concerns raised by the objections are dealt with in the Debtor's Plan.

- Mr. Zarifi authorized the Debtor to engage in a number of unauthorized post-petition transactions. (12/17/2019 Trial Tr. 47:24-48:24, 49:14-20, 50:14-52:4; DE 278; DE 306; *see* TE 83).

- Mr. Zarifi, on behalf of Skyline, on numerous occasions throughout this case sought and obtained Court approval for the sale of certain real property. (TE 65 at 4). At least five lot sales closed, and creditors were paid; however, no reports of sale were filed, as required by Rule 6004(f)(1), until shortly before the start of the confirmation hearing. (*See* TE 20).

- Mr. Zarifi paid a portion of his home mortgage in May 2019 using Skyline funds. (TE 180; 1/16/2020 Trial Tr. 50). The operating report characterizes the transaction as an advance, but no Court approval was obtained. (*See* 12/17/2019 Trial Tr. 50:2-51:10).

- Mr. Zarifi prepared, signed, and filed numerous inaccurate and untimely operating reports. (*See* 12/17/2019 Trial Tr. 41:8-46:19; *see also* DE 100; DE 101; DE 128; DE 129; DE 188; DE 190; DE 191; DE 250; DE 251; TE 65; DE 308; DE 346; DE 347).[58]

- Pre-petition, Mr. Zarifi pledged property owned by a relative as collateral in order to borrow money on behalf of the Debtor. (12/18/2019 Trial Tr. 87:9-21).

- Mr. Zarifi underreported or did not report disbursements, which underreporting and non-reporting caused errors in the calculation of the fees owing to the U.S. Trustee. (12/17/2019 Trial Tr. 55:16-56:4).[59]

- Mr. Zarifi has allowed his brother to live rent-free in a piece of real property owned by the Debtor because Mr. Zarifi believes he owes a personal obligation to his brother. (12/18/2019 Trial Tr. 77:14-78:25).

- Contrary to his testimony during the confirmation trial, Mr. Zarifi authorized Skyline's counsel to commence a judicial foreclosure action in state court on or about February 27, 2020. (*Compare* 1/16/2020 Trial Tr. at 58, 111 *with* 4/9/2020 25:18-19).

---

[58] The monthly operating reports that were originally prepared by Mr. Zarifi were subsequently amended by Mr. Linscott, who testified that the monthly operating reports were accurate as amended. (12/17/2019 Trial Tr. 80:5-80:7, 81:20-22).

[59] This calculation has since been corrected, and Mr. Linscott testified that to his knowledge, U.S. Trustee fees were current as of December 17, 2019. (12/17/2019 Trial Tr. 79:23-25, 81:16-82:2).

Many of Mr. Zarifi's managerial missteps were only corrected after they were brought to his, or the Court's, attention by opposing parties in this case.

Under the Debtor's Plan, Mr. Zarifi remains Skyline's manager, and sole decision-maker. Post-confirmation reporting is not as detailed and is only required on a quarterly basis. Given Mr. Zarifi's conduct during the course of this case, the Court is not confident that the reporting to creditors would be sufficiently detailed, accurate, or timely. Mr. Zarifi's testimony regarding the Cinco litigation and the other disputed claims also raises concerns that Mr. Zarifi would continue to litigate disputed claims no matter the cost, no matter the delay, even if such litigation is not in the financial interest of the Debtor or its creditors. (*See* 1/16/2020 Trial Tr. 53:1-54:5).

Further, although Mr. Linscott is the proposed Disbursing Agent, his role under the Debtor's Plan, as proposed, is very limited. He would have no control over the Debtor's accounts, would not decide what properties are to be sold or refinanced in order to pay claims, would not decide how claims litigation or the Cinco litigation would be prosecuted, would not have any settlement authority regarding claims litigation or the Cinco litigation, and would not have any control over the cost of such litigation. It could take years and be extremely costly to resolve the disputed claims and Cinco litigation. As the Debtor's counsel acknowledged during closing arguments, no budget had been proposed for the cost of continuing litigation.[60]

Based upon the totality of the evidence presented, the Court finds that Mr. Zarifi's continued management of the Debtor while pre-petition claims remain unresolved and unpaid, is not in the best interest of creditors or public policy. Cinco's § 1129(a)(5) objection is therefore sustained.

As noted above, the Debtor has recognized that it may be necessary to give the Disbursing Agent additional authority under its plan. In that regard, in order to satisfy the requirements of § 1129(a)(5), the Debtor's Plan would need to be amended to provide the Disbursing Agent with sufficient decision-making authority to address the concerns raised above.

### 2. **Cinco Plan**

Although the Debtor has not raised a § 1129(a)(5) objection to Cinco's Plan, the Court

---

[60] Mr. Pack estimated a budget of $60,000-70,000, as pure speculation.

will address the § 1129(a)(5) requirement as it pertains to Cinco's Plan given Cinco's recent plan modification.

The Court notes that Cinco modified its plan to provide that Mr. Linscott would serve as the proposed Disbursing Agent, rather than Mr. Sheafe, and would receive the settlement funds from Cinco, have access to the funds in the DIP account for payment of claims, and be authorized to pay all claims. Mr. Zarifi would retain his interest in Skyline, which would retain all assets after the payment of claims.

However, the following provisions of Cinco's Plan, as modified, appear to be inconsistent with the foregoing:

- § IV.D. – This section provides that Mr. Sheafe and Mr. Zarifi would agree on causes of action that would not be deemed released.

- § IV.F. – This section provides that post-Effective Date, only the reorganized Debtor and Cinco would have the authority to resolve claims.

- § IV.J. – This section provides that Mr. Sheafe or officers of the reorganized Debtor would be authorized to take any actions necessary to effectuate Cinco's Plan.

- § V.E. – This section provides that Cinco or the reorganized Debtor would be able to move the Court for an order estimating any disputed claim.

- § V.F. – This section would give authority to the reorganized Debtor and Cinco with respect to claims bar date issues.

- § VI.B. – This section would give claim settlement authority to the reorganized Debtor and Cinco.

- § VI.C. – This section would grant the reorganized Debtor authority with respect to setoffs.

- § VI.D. – This section only provides exculpation and limitation of liability to the reorganized Debtor and Cinco.

- § VIII.A.16 – This section provides that after the Effective Date only the reorganized Debtor would have authority to object to claims and interests.

- § VIII.A.22 – This section provides for distributions on the Effective Date by the

reorganized Debtor.

It appears to the Court that these sections require modification to address the role of the Disbursing Agent under Cinco's Plan. If clarification is provided to address the inconsistencies raised above, then it would be the determination of the Court that Cinco's Plan would comply with § 1129(a)(5).

### E.  Section 1129(a)(7)(A) – Best Interest of Creditors Test

The Debtor argues that Cinco's Plan fails to satisfy the best interest of creditors test set forth in § 1129(a)(7)(A), which requires that each holder of a claim or interest in an impaired class either accept the plan or receive or retain under the plan at least as much as it would receive in a chapter 7 liquidation. 11 U.S.C. § 1129(a)(7)(A); *In re Bashas' Inc.*, 437 B.R. at 914.

Cinco's Plan proposes to leave Mr. Zarifi's equity interest unimpaired. The Debtor argues that contrary to Cinco's assertion, Mr. Zarifi's equity interest is in fact impaired because Cinco's Plan proposes to strip Mr. Zarifi of any right to determine whether and on what terms the Debtor will settle its claims. Further, the Debtor argues that Mr. Zarifi would receive substantially less under Cinco's Plan than he would under a hypothetical chapter 7 liquidation because there is no evidence that a chapter 7 trustee would agree to the proposed settlements in Cinco's Plan, which settlements the Debtor believes are unreasonable.

In order to determine whether a plan satisfies § 1129(a)(7), a court must determine what creditors and interest holders would receive under a hypothetical chapter 7 liquidation, and compare that hypothetical liquidation return with what creditors and interest holders would receive under the proposed plan. *In re Tenderloin Health*, 849 F.3d 1231, 1237 (9th Cir. 2017).

"[A] hypothetical liquidation entails a considerable degree of speculation about a situation that will not occur unless the case is actually converted to chapter 7." *In re Sierra-Cal*, 210 B.R. 168, 172 (Bankr. E.D. Cal. 1997). Such an analysis "requires estimation of disputed and contingent claims and of chapter 7 administration expenses[,]" and typically "contemplates valuation according to the depressed prices that one typically receives in distress sales." *Id.* Given the speculative nature of a § 1129(a)(7) analysis, "[i]n computing the hypothetical chapter 7 liquidation, the court is entitled to view the entire record of the case and

to engage in rational speculation about what would occur in a chapter 7 liquidation." *Id.* at 174.

As an initial note, Mr. Zarifi did not cast a ballot accepting or rejecting either plan, and Mr. Zarifi has not objected to Cinco's Plan.[61] Apparently Skyline is raising this objection on Mr. Zarifi's behalf, which supports the Court's determination that there is no distinction between Mr. Zarifi and Skyline.

A class of interests is unimpaired if, "with respect to each . . . interest of such class, the plan leaves unaltered the legal, equitable, and contractual rights to which such . . . interest entitles the holder of such . . . interest[.]" 11 U.S.C. § 1124(1).

Under Cinco's Plan, Mr. Zarifi would remain manager of the Debtor and retain all of his rights under the Debtor's organizational documents. Further, as set forth above, this Court has determined that Mr. Zarifi should not be in charge of decisions regarding implementation of the plan, or litigation / settlement of claims.

Even if Mr. Zarifi's equity interest is impaired under Cinco's Plan, Mr. Zarifi would receive or retain under Cinco's Plan at least as much as he would receive in a chapter 7 liquidation. The Debtor inaccurately argues that the value of the Skyline Loan is in excess of $8 million. In fact, the liquidation value of such asset is no more than $5 million, and is likely less. (*See* DE 404 at ¶ 4, Ex. B; TE 16). Further, Skyline ignores the provision in the First Amendment, which provides that the Sheafe Note is entitled to parity with the Skyline Note in payment and term. Additionally, even though the Court has found that the amount that Cinco proposes in order to settle its claims is insufficient for purposes of the Court's § 1129(a)(1) analysis, a chapter 7 liquidation in this case could involve substantial chapter 7 trustee fees and administrative expenses, which would further reduce the value of Mr. Zarifi's interest.

Based upon the foregoing, the Court finds that Cinco's Plan satisfies the requirements of § 1129(a)(7).

### F. Section 1129(a)(11) – Feasibility

Objectors to Cinco's Plan argue that Cinco's Plan does not satisfy the feasibility

---

[61] The Court will note that Mr. Zarifi has been represented by independent counsel during these proceedings and filed an objection to Cinco's initial disclosure statement, but did not file an objection to Cinco's Plan. (*See* DE 192).

requirements set forth in § 1129(a)(11) because Cinco has not demonstrated that it has the available funds to implement Cinco's Plan.

Section 1129(a)(11) requires that a plan be feasible in order to be confirmed. A plan is feasible if confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). "The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the [plan proponent] can possibly attain after confirmation." *Matter of Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985) (quoting 5 *Collier on Bankruptcy* ¶ 1129.02[11] at 1129-34 (15th ed. 1984)).

A plan is feasible if it "offers a reasonable prospect of success and is workable." *In re Patrician St. Joseph Partners Ltd. P'ship*, 169 B.R. 669, 674 (D. Ariz. 1994). "The Code does not require the [plan proponent] to prove that success is inevitable or assured, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility." *Wells Fargo Bank v. Loop 76, LLC (In re Loop 76, LLC),* 465 B.R. 525, 544 (B.A.P. 9th Cir. 2012), *aff'd*, 578 F. App'x 644 (9th Cir. 2014).

While "[t]he mere potential for failure of the plan is insufficient to disprove feasibility[,]" *In re Patrician St. Joseph Partners Ltd. P'ship*, 169 B.R. at 674, the plan proponent must present "ample evidence to demonstrate that the [p]lan has a reasonable probability of success." *In re Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir. 1986).

Courts consider the following factors when evaluating the feasibility of a plan:

> (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*In re Bashas' Inc.*, 437 B.R. at 915 (citing *In re Wiersma,* 324 B.R. 92, 113 (B.A.P. 9th Cir. 2005), *aff'd in part and rev'd in part on other grounds,* 483 F.3d 933 (9th Cir. 2007)).

Cinco proposes to fund its plan using the proceeds from the Cinco settlement, which

proceeds Cinco proposes to tender in one lump sum. In order to make the settlement payment, Mr. Sheafe testified that Cinco had arranged to obtain a loan secured by the Cinco Soldados Property, and guaranteed by Mr. Sheafe. (2/6/2020 Trial Tr. 82:22-83:6, 83:18-84:9, 112:8-14, 113:1-12). Mr. Sheafe testified that funding of the loan could occur within thirty (30) days of plan confirmation. (2/6/2020 Trial Tr. 84:4-9). Cinco's counsel confirmed this during closing arguments. (4/9/2020 Trial Tr. 69:20-70:9).

Although no written commitment or other supporting documentation was introduced into evidence, the Court finds Mr. Sheafe to be credible, and the Court finds Mr. Sheafe's testimony sufficient to satisfy Cinco's relatively low burden of proving that its plan is feasible.

It is the determination of the Court that Cinco's Plan meets the requirements of § 1129(a)(11), so long as the Effective Date occurs within thirty (30) days of entry of a final order of confirmation.

**G.    Section 1129(b)**

Each side argues that the other's plan does not satisfy § 1129(b), which provides that if all applicable requirements of § 1129(a) are met, with the exception of § 1129(a)(8),[62] the Court can confirm a plan so long as it does not discriminate unfairly and is fair and equitable with respect to impaired classes that have not accepted the plan.

**1.    Debtor's Plan**

The non-insider general unsecured creditor classes are impaired under the Debtor's Plan and have voted to reject the Debtor's Plan. Therefore, the Debtor's Plan must satisfy the provisions of § 1129(b) by: (a) treating the non-insider general unsecured classes fairly and equitably; and (b) not discriminating unfairly against the non-insider general unsecured classes. *See In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d at 653.

**a.    Fair & Equitable Requirement**

The objectors to the Debtor's Plan argue that the Debtor's Plan is not fair and equitable because it provides for the improper subordination of non-insider general unsecured claims and ignores the requirement that Mr. Zarifi may not retain his ownership interest absent full payment of claims with interest or a sufficient new value contribution. The objectors also argue that the

---

[62] In this case, neither plan satisfies § 1129(a)(8).

Debtor's Plan unfairly discriminates by subordinating the unsecured claims to secured claims, secured by non-income producing properties.

Pursuant to § 1129(b)(2)(B), a plan is fair and equitable with respect to a class of unsecured claims if:

> (i)    the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
>
> (ii)    the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property . . . .

The Debtor's Plan provides that Mr. Zarifi would retain his equity interest in the Debtor and makes no provision for a new value contribution. Holders of non-insider general unsecured claims must therefore be paid the full present value of their claims. *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d at 654.

For purposes of § 1129(b)(2)(B)(i), "[d]eferred cash payments to an impaired class must be valued as of the effective date of the plan . . . ." *In re Dunlap Oil Co., Inc.*, 2014 WL 6883069, at *19. Accordingly, impaired unsecured claims receiving deferred cash payments under a plan proposing to satisfy § 1129(b)(2)(B)(i) are entitled to interest on their claims. *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d at 654.

Given that the Debtor's Plan is proposing to pay allowed non-insider general unsecured claims in full in deferred cash payments over 36 months with interest to accrue at the Plan Rate[63] from the Petition Date, the Debtor's proposed treatment of these claims satisfies § 1129(b)(2)(B)(i).

### b.    No Unfair Discrimination Requirement

The objectors to the Debtor's Plan further argue that the Debtor's Plan discriminates

---

[63] Under the Debtor's Plan, the "Plan Rate" means "an annual rate of interest equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the Effective Date, or such other rate of interest as the Bankruptcy Court determines to be necessary to satisfy any requirements for confirmation." (TE 21 at § 1.34). No evidence was presented to controvert the sufficiency of the Plan Rate.

unfairly against the non-insider general unsecured class by imposing undue risk in terms of payment delays.

The Debtor proposes to begin making payments to the non-insider general unsecured class upon the earlier of the time all claims of a higher priority have been paid in full or one year after the Effective Date. However, to the extent any underlying non-insider general unsecured claims remain unliquidated, contingent, and/or disputed one year after the Effective Date, no payments on behalf of such claims would commence until such claims became allowed. Under the Debtor's Plan, all unliquidated, contingent, and/or disputed non-insider general unsecured claims would be allowed or disallowed through a claims litigation process controlled by Mr. Zarifi.

Insider general unsecured creditors, on the other hand, would be paid in full no later than five years after the Effective Date. Given the possibility of and delay attendant to ongoing litigation, it is possible that under the Debtor's Plan, insider general unsecured claims would be paid prior to non-insider general unsecured claims.

Although there is a disputed claims reserve proposed in the Debtor's Plan, which the Debtor purports would protect non-insider general unsecured creditors holding claims subject to ongoing litigation, there is no requirement that this reserve be funded. (12/17/2019 Trial Tr. 40:1-23).

Mr. Linscott testified that, as Disbursing Agent, he would not likely fund the disputed claims reserve until all prior classes of creditors had been paid in full, and that he had not calculated how much he would reserve. (12/17/2019 Trial Tr. 76:21-77:14, 89:2-13, 91:7-20). Mr. Linscott further testified that he would fund the disputed claims reserve using funds from asset sales and/or monies loaned by Will Power. The Debtor's Plan, however, does not provide Mr. Linscott with any authority to sell assets, require the sale of assets to fund the reserve, or provide Mr. Linscott with any authority to compel Will Power to fund a loan to the Debtor. (12/17/2019 Trial Tr. 88:10-25).

Ultimately, the Debtor's Plan does not sufficiently protect non-insider general unsecured creditors from a potential dissipation of assets during the post-confirmation, pre-payment period,

and as such, unfairly discriminates against non-insider general unsecured creditors.

Based upon the foregoing, the Debtor's Plan fails to satisfy § 1129(b).

**2. <u>Cinco's Plan</u>**

**a. Fair & Equitable Requirement**

The Debtor argues that Cinco's proposed treatment of Mr. Zarifi's equity interest is not fair or equitable on the basis that Cinco's Plan proposes to strip Mr. Zarifi of millions of dollars of equity by involuntarily subjecting the Debtor to "windfall settlements," and because Cinco's Plan proposes to unjustly enrich Mr. Sheafe at the Debtor's and Mr. Zarifi's expense.

A plan is fair and equitable with respect to a class of interests if:

> (i) the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

> (ii) the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

11 U.S.C. § 1129(b)(2)(C).

As an initial matter, Mr. Zarifi has not personally filed an objection to Cinco's Plan, and the Debtor has not established that it has standing to assert this objection on his behalf.[64]

Further, § 1129(b)'s requirement that a plan be fair and equitable does not apply to unimpaired classes. Under the Cinco Plan Mr. Zarifi would retain his 100% ownership interest in the Debtor, remain the manager of the Debtor, and retain all of his rights under the Debtor's organizational documents. His equity interest would be unimpaired under Cinco's Plan.

Even if Mr. Zarifi's equity interest is impaired under Cinco's Plan, Cinco's proposed treatment of Mr. Zarifi's equity interest is fair and equitable given that there are no junior equity security holders who would receive or retain anything under Cinco's Plan. Cinco's Plan therefore satisfies § 1129(b)(2)(C)(ii).

---

[64] See *supra* n. 61.

1       **b.**     **No Unfair Discrimination Requirement**

2       The Debtor and Mr. S. Zarifi also argue that Cinco's Plan unfairly discriminates against

3 Mr. Zarifi. However, as noted above, Mr. Zarifi did not object to Cinco's Plan. Further, neither

4 Mr. S. Zarifi, nor the Debtor, has established standing to raise this objection.

5       Additionally, "the concept of unfair discrimination applies to plans in which claims or

6 interests have been subordinated." *In re Acequia, Inc.*, 787 F.2d at 1364. The requirement that a

7 plan not unfairly discriminate against a class of interests requires that the plan "allocate value to

8 the class in a manner consistent with the treatment afforded to other classes with similar legal

9 claims against the debtor." *Id.* (quoting *Collier on Bankruptcy* ¶ 1129.03, at 1129-50 (15th ed.

10 1979)). In this case, there are no other similarly situated classes of interests, or any classes

11 subordinate to Mr. Zarifi's equity interest. Thus, there is no unfair discrimination within the

12 meaning of § 1129(b).

13       Based upon the foregoing, it is the determination of the Court that Cinco's Plan satisfies

14 § 1129(b).

15       **H.**     **Section 1129(c)**

16       Given that the Court has determined that neither plan is confirmable, the Court need not

17 engage in a § 1129(c) analysis at this time.

18 **V.**    **Conclusion**

19       Based on the foregoing analysis of all outstanding factual and legal issues, and based on

20 the totality of the evidence presented in this case, the Court finds and concludes that: (1) the

21 Debtor has failed to meet its burden of establishing that the Debtor's Plan satisfies the provisions

22 of §§ 1129(a)(5) and (b); and (2) Cinco has failed to meet its burden of establishing that Cinco's

23 Plan satisfies the provisions of §§ 1129(a)(1), and (a)(5).

24       Wherefore, based upon the foregoing and for good cause shown;

25       **IT IS HEREBY ORDERED** that the objections to the Debtor's Plan are sustained in

26 part and overruled in part.

27       **IT IS FURTHER ORDERED** that the objections to Cinco's Plan are sustained in part

28 and overruled in part.

**IT IS FURTHER ORDERED** that confirmation of the Debtor's Plan is denied.

**IT IS FURTHER ORDERED** that confirmation of Cinco's Plan is denied.

**IT IS FURTHER ORDERED** that the Debtor and Cinco are each granted thirty (30) days from the entry of this order to file amended plans to rectify the deficiencies discussed in this ruling. If neither party timely files an amended plan, the Court will consider dismissal or conversion of this case.

**DATED AND SIGNED ABOVE.**